[No. 30085-4-III.   Division Three.   August 14, 2012.]

ELINOR JEAN TATHAM, *Respondent*, v. JAMES CRAMPTON ROGERS, *Appellant*.

78

*James E. Lobsenz, Kenneth S. Kagan, Michael B. King,* and *Gregory M. Miller* (of *Carney Badley Spellman PS*), for appellant.

*Peggy A. Bierbaum*; and *Valerie A. Villacin* and *Catherine Wright Smith* (of *Smith Goodfriend PS*), for respondent.

¶1 SIDDOWAY, J. — Washington's appearance of fairness doctrine not only requires a judge to be impartial, it also requires that the judge appear to be impartial. *State v. Finch*, 137 Wn.2d 792, 808, 975 P.2d 967 (1999). This case calls upon us to decide whether, and by what standard, James Rogers[1] may obtain relief from a judgment where he learned of facts following trial, previously unknown, that give rise to a reasonable concern that he did not receive a

---

[1] Mr. Rogers passed away during the pendency of the appeal. His estate has been substituted as the appellant.

fair, impartial, and neutral hearing. A reasonable concern can exist even where there is no proof of actual bias.

¶2 We hold that a violation of the appearance of fairness doctrine does not result in a void judgment but does result in a judgment that may be vacated under CR 60(b)(11). To obtain relief, the moving party must demonstrate a risk of injustice to the parties if relief is not granted. The showing was made here. Because we remand for a new trial, we do not reach Mr. Rogers' alternative challenges to the distribution provided by the judgment.

## FACTS AND PROCEDURAL BACKGROUND

¶3 Elinor Tatham and James Rogers ended a nine-year committed intimate relationship in February 2006. In January 2007, Dr. Tatham filed the action below, seeking an equitable division of their community-like property. She later filed a petition for the entry of a parenting plan addressing the parties' rights and obligations for the care and support of their daughter. Both matters were tried in April 2009 before Judge Craddock Verser, then the lone superior court judge in Jefferson County, where the parties lived and the action was filed.

¶4 The evidence at trial established that Dr. Tatham was then 47 years old and worked as a physician, and that Mr. Rogers was 52 years old and pursued work as a carpenter while attending school. Dr. Tatham had continuously worked as a physician during the parties' relationship, while Mr. Rogers had been unemployed for the most part, devoting his energy and efforts and a portion of his income to renovating a house he had purchased in 1994. The house was referred to during trial as the "Rosewind home." Mr. Rogers' main source of income was a substantial inheritance, which amounted to $1,360,000[2] at the time of separation and $917,000 at the time of property division. The

---

[2] All dollar amounts are approximations.

parties agreed that the inheritance was Mr. Rogers' separate property.

¶5 Mr. Rogers presented evidence at trial that deterioration in his mental health since 2008 made him effectively unemployable. Several of his friends testified that since 2008 they had witnessed episodes in which Mr. Rogers spoke rapidly, nonsensically, and abusively. Three agreed that they would not hire Mr. Rogers to perform carpentry work in his current state. Although not a psychiatrist, Dr. Tatham described his outbursts as "manic psychotic episode[s]." Report of Proceedings (RP) (Apr. 16, 2009) at 259. Mr. Rogers testified that he had visited several mental health doctors and professionals but had not been diagnosed with a mental illness, nor was he currently undergoing treatment. In connection with the parenting plan issues, the trial court found that Mr. Rogers was afflicted by "an emotional/mental disorder" and denied Mr. Rogers visitation with his daughter until he received a full mental health evaluation and pursued treatment if needed. Clerk's Papers (CP) (Sept. 9, 2010) at 5.

¶6 Both parties entered the relationship with separate property, and they acquired significant community-like property during the relationship. They agreed as to the characterization of their property, and the court accepted the parties' characterization. The separate property consisted of the following:

Separate Property

| Elinor Tatham | James Rogers |
| --- | --- |
| Funds from two Edwards Jones accounts, rolled into a TD Waterhouse account | Rosewind home |
| | Property in Stratford, Connecticut |
| | 2003 inheritance, held in a Merrill Lynch account |
| | Quimper Credit Union account |

The court found the total value of the parties' separate property at the time of separation to be $18,911 in the case of Dr. Tatham's property and $1,360,203 in the case of Mr. Rogers'.

¶7  It found the following to be the parties' community-like property, on which it placed the following values:

### Community-Like Property

| Property | Value |
| --- | --- |
| Unimproved lot on Tibbals Street, purchased in 2003 | $90,000 |
| Eddy Street home purchased for Dr. Tatham's residence following the parties' separation | $111,000 |
| Dr. Tatham's one-sixth interest in a medical corporation owning the Watership Medical Building | $82,000 |
| TD Waterhouse investment accounts | $111,000 |
| Jefferson Healthcare retirement account | $77,000 |
| A "529" college savings account for the parties' daughter | $54,000 |
| A right of reimbursement for community investment into the Rosewind house | $100,000 |

Of this $625,000 in value of community-like assets, the court awarded 75 percent, or $471,000 in value, to Dr. Tatham, and 25 percent, or $154,000 in value, to Mr. Rogers, allocating the assets as follows:

| Elinor Tatham | James Rogers |
| --- | --- |
| Unimproved lot on Tibbals Street | Right of reimbursement for community investment in Rosewind property |
| Eddy Street home | |
| One-sixth interest in Watership Medical Building | 529 college savings account for daughter |
| TD Waterhouse investment accounts | |
| Jefferson Healthcare retirement account | |

¶8 The trial court disclosed that its uneven distribution was heavily influenced by Mr. Rogers' considerable separate assets, stating:

> Mr. Rogers has substantially more separate property than Dr. Tatham. The extent of his separate property in comparison to Dr. Tatham's minimal separate property is a compelling reason to award Dr. Tatham most of the property which would have been characterized as community property had the parties been married. In addition, most of the community property was acquired as a result of Dr. Tatham's employment.

CP (Oct. 19, 2009) at 120 (Conclusion of Law 16).

¶9 Mr. Rogers moved for reconsideration of the property division, arguing that given his deteriorating mental health and relatively limited earnings he should have been awarded more than 25 percent of the community-like property. He also pointed out that if the 529 account for the parties' daughter's education was disregarded or treated as equally divided (contending that he or Dr. Tatham would have preserved it for their daughter), the community-like assets were distributed 82 percent to Dr. Tatham and only 18 percent to Mr. Rogers.

¶10 The trial court denied the motion in August 2009, citing Mr. Rogers' failure to present evidence of a mental health diagnosis or that his alleged mental health issues affected his ability to earn income or manage his financial assets. Mr. Rogers timely appealed the July 2009 judgment distributing the community-like property.

¶11 After entry of the judgment, Mr. Rogers heard rumors that caused him concern that the trial judge's prior relationship and associations with Dr. Tatham's lawyer, Peggy Ann Bierbaum, resulted in bias that predisposed him to enter a ruling favorable to Dr. Tatham. Mr. Rogers believed that Judge Verser[3] had acted in a biased manner toward him during his trial and seemed to favor Ms.

---

[3] We speak of the trial judge by name hereafter for clarity, it being impossible to analyze the recusal issue without discussing his personal role and dealings at

Bierbaum. He hired a private investigator. The investigator determined and reported back the following associations between the judge and Ms. Bierbaum, most of which pre-dated the January 2007 commencement of Dr. Tatham's action and the April 2009 trial by several years:

- Before being elected to the superior court in 2004, Judge Verser and attorney Bierbaum had been the sole partners in the law firm of Verser and Bierbaum from November 2002 until March 2004.

- Judge Verser was arrested in February 2003 for driving under the influence (DUI) and Ms. Bierbaum was riding with him in the car as his sole passenger at the time of the arrest. Ms. Bierbaum posted his $500 bail and may have made representations to an officer that she was acting as Judge Verser's attorney.

- Ms. Bierbaum served as Judge Verser's campaign manager for his successful 2004 election campaign and contributed about $2,000.

- Ms. Bierbaum designated Judge Verser as her alternate attorney-in-fact on a durable power of attorney notarized by Judge Verser and recorded in April 2005, allowing him to manage all of her property in the event that her husband, whom she designated as her primary attorney-in-fact, was unable to do so.

- Judge Verser appointed Ms. Bierbaum as a Jefferson County Court Commissioner in 2008 and administered the oath of office to her.

The private investigator also reported to Mr. Rogers that a small plaque hanging in Judge Verser's courtroom contained some disclosure of his relationship with Ms. Bierbaum, in the form of the judge's declaration that 15 lawyers named on the plaque had " 'practiced law with me, served on my election committee, or had a business relationship with me.' " CP (Sept. 9, 2010) at 40. The particulars of the individual lawyers' dealings with the judge were not indi-

---

some length. In deviating from our usual practice of referring to the "trial court," we intend no disrespect.

cated. The 15 names appeared in alphabetical order. Ms. Bierbaum was included in the list.

¶12 Judge Verser did not disclose any prior or existing association with Ms. Bierbaum on the record before the property distribution trial. Mr. Rogers claims that he was unaware of the judge's associations with Ms. Bierbaum before the court's disposition of the case, never saw the plaque, and would have exercised his right to file an affidavit of prejudice had he been aware of the judge's associations with Dr. Tatham's lawyer.

¶13 Mr. Rogers filed a motion for relief from judgment in May 2010, asserting for the first time that Judge Verser should have recused himself from hearing and deciding the case because of his associations with Ms. Bierbaum. Relying on CR 60(b)(5) and (11), Mr. Rogers argued that the judge's failure to recuse himself or disclose the associations violated his right of due process and the appearance of fairness doctrine. He filed a contemporaneous motion asking that a visiting judge be assigned to consider the CR 60 motion.

¶14 Judge Verser denied Mr. Rogers' request to have a visiting judge hear the CR 60(b) motion. Following argument from the parties, he also denied Mr. Rogers' CR 60(b) motion. In announcing his decision, Judge Verser asserted that all three attorneys who served as Mr. Rogers' trial counsel at various points in the proceedings knew everything pertinent to the recusal issue prior to trial, with the exception of the alternate power of attorney granted him by Ms. Bierbaum that the judge asserted was never used. Because of Mr. Rogers' attorneys' asserted prior knowledge, Judge Verser concluded that the motion should be denied as untimely. He also concluded that the facts that Mr. Rogers contended demonstrated bias did not justify recusal in any event.

¶15 After his motion for reconsideration was denied and a judgment denying the motions was entered, Mr. Rogers filed a second appeal. The appeals were consolidated. Division Two of the Court of Appeals, in which the appeals

were originally filed, transferred them to this court for disposition.

## ANALYSIS

### I

■ ■ ¶16 We first address Mr. Rogers' argument that Judge Verser should have recused himself from ruling on his CR 60(b) motion. Recusal decisions lie within the sound discretion of the trial court. *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995). We review a trial court's recusal decision for an abuse of discretion. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 840, 14 P.3d 877 (2000). The court abuses its discretion when its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

■ ¶17 It is unusual to require a judge to recuse himself or herself from ruling on a motion for a new trial even where the motion is based on grounds that are critical of the trial judge. The trial judge is fully informed and is presumed to perform his or her functions regularly and properly without bias or prejudice. *See, e.g., Wolfkill*, 103 Wn. App. at 841. A different rule could reward groundless tactical attacks. Ordinarily,

> [t]he nonmoving party has the right to have the trial judge make the decision [on the new trial motion] and the moving party should not be able to force the judge to recuse himself in ruling on such a motion by including allegations directed at the trial judge himself.

*Jones v. Halvorson-Berg*, 69 Wn. App. 117, 129, 847 P.2d 945 (1993).

¶18 Where a perceived attack on the trial court is not a basis for other relief, however, but is the very subject matter of the proceeding, recusal may be required. In *Halvorson-Berg* the appellate court held that the trial judge was "in the

best position to rule on whether the moving party [was] entitled to a new trial" even though the request was based on the moving party's allegation—disputed by the trial judge—that he had laughed at the party's witnesses. *Id.* at 128-29. But it nonetheless reversed the trial court's decision that it should also hear and decide whether to sanction the moving party for its perceived attack on the trial court's integrity:

> [O]nce the ruling is made that the alleged facts do not constitute a basis for granting a new trial, consideration of additional motions may require a different judge. If, as in this case, the trial judge is of the opinion that the integrity of the court has been attacked and CR 11 sanctions are appropriate or a contempt proceeding is warranted, then such a hearing should be conducted before another judge. When the subject of the CR 11 hearing is the alleged inappropriate conduct of the trial judge, that judge should not rule on the truth or falsity of the accusations.

*Id.* at 129.

■ ¶19 Even where recusal is not required, it may be well advised. In *Mayberry v. Pennsylvania*, 400 U.S. 455, 463, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971), the United States Supreme Court addressed the problem presented by the continued participation of a judge who feels he has been attacked. The court observed, "[W]e do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case." *Id.* at 463-64. Yet, "it is generally wise where the marks of . . . unseemly conduct have left personal stings to ask a fellow judge to take his place." *Id.* at 464. " 'The vital point is that in sitting in judgment . . . the judge should not himself give vent to personal spleen or respond to a personal grievance.' " *Id.* at 465 (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S. Ct. 11, 99 L. Ed. 11 (1954)).

■ ¶20 Mr. Rogers asks us to find an abuse of discretion where a trial court refuses to recuse itself when faced with a motion accusing it of violating the appearance of fairness

doctrine by presiding over a trial and failing to disclose potential conflicts of interest. His CR 60(b) motion is more like the motion for a new trial presented in *Halvorson-Berg* and the many other motions for a new trial that are predicated on some asserted error, abuse of discretion, or other misconduct by a trial judge. Such motions are properly heard by the trial judge. Certainly a trial judge who feels personally stung by the matters being alleged and argued by the moving party would be wise to ask a fellow judge to take his place, but recusal is not required. We find no abuse of discretion.

## II

¶21 The more difficult issue presented is whether the trial court abused its discretion by then denying the CR 60(b) motion seeking relief from the judgment. A trial court's discretion is abused when based on untenable grounds or reasons. *In re Marriage of Flannagan*, 42 Wn. App. 214, 223, 709 P.2d 1247 (1985). An abuse of discretion is found if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006). We review the underlying questions of law de novo. *Id.*

¶22 On the facts of this case and given the arguments made below and on appeal, four matters require examination: (1) the purely legal issue of whether Mr. Rogers' interest at stake is his right to due process or his nonconstitutional right to a trial satisfying the appearance of fairness doctrine, (2) whether the trial court abused its discretion in concluding that Mr. Rogers' objection was waived by his failure to raise it before the property distribution trial, (3) whether a motion under CR 60(b) is proper procedure for seeking to set aside a judgment entered in violation of the appearance of fairness doctrine and what

showing is required, and (4) whether the required showing was made in this case.

*Due Process Right to an Impartial Tribunal*

■ ¶23 "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). Despite the breadth with which the United States Supreme Court has expressed the right to a " 'fair trial in a fair tribunal,' " *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955)), "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986)). "Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Id.* (citing, in part, ABA Code of Judicial Conduct (ABA CJC) Canon 3C(1)(a) (1972)).

■ ¶24 The due process clause incorporated the common law rule that judges must recuse themselves when they have "a direct, personal, substantial[ ] pecuniary interest" in a case. *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749 (1927). In *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009), the Supreme Court noted that additional bases for recusal required by due process had been identified "[a]s new problems have emerged that were not discussed at common law"; surveying its cases, it identified only two: financial interests falling short of what would be considered personal or direct, *see Lavoie*, 475 U.S. at 822 (in which a state Supreme Court justice was lead plaintiff in a different

pending lawsuit involving an issue nearly identical to that presented by the case in which he was asked to recuse), and criminal contempt cases or other cases where the judge was responsible for determining that a defendant should be charged, *see Murchison*, 349 U.S. at 136 (where judge was responsible for the charging decision in state's "one-man grand jury" process, it would offend due process for him to preside at trial); *Mayberry*, 400 U.S. at 466 (due process requires that a defendant in a criminal contempt proceeding should be tried before a judge "other than the one reviled by the contemnor").

¶25 With *Caperton*, the Court identified a third instance where due process would require recusal: where someone with a personal stake in a proceeding has had a significant and disproportionate role in placing the judge on the case. 556 U.S. at 884. At issue was a justice of the West Virginia Supreme Court of Appeals who refused to recuse himself from participating in the appeal of a $50 million jury verdict against Massey, whose chief executive officer substantially bankrolled the campaign by which the justice was elected, at a time when it was likely Massey would appeal. Although the dissent characterized the decision as extending the due process right to cases presenting a probability of bias that "cannot be defined in any limited way," *id.* at 890 (Roberts, J., dissenting), the Court held that under its precedents "there are objective standards that require recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Id.* at 872 (quoting *Withrow*, 421 U.S. at 47). The Court limited this third category of due process requiring recusal to only those campaign activities that present "a serious risk of actual bias—based on objective and reasonable perceptions"; those being only "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case." *Id.* at 884. It described its decision as "address[ed to] an extraordinary situation" and facts that "are extreme by any measure." *Id.* at 887.

¶26 *Caperton* reaffirmed that " 'most matters relating to judicial disqualification [do] not rise to a constitutional level,' " *id.* at 876 (alteration in original) (quoting *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702, 68 S. Ct. 793, 92 L. Ed. 1010 (1948)), and that "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.' " *Id.* (quoting *Lavoie*, 475 U.S. at 820). It emphasized that state codes of judicial conduct provide more protection than due process requires, and that "most disputes over disqualification will be resolved without resort to the Constitution." *Id.* at 890. In this regard, its decision echoed the amicus brief filed by the Conference of Chief Justices (Conference) of the state Supreme Courts, which had pointed out that "[e]ach State sets more rigorous requirements for disqualification and recusal within its own jurisdiction, through state constitutional provision, statute, court rule, judicially promulgated canon of ethics, local practice and/or legal precedent." Br. of Conference as Amicus Curiae in Supp. of Neither Party, *Caperton v. A.T. Massey Coal Co.*, No. 08-22, 2009 WL 45973, at *2-3 (U.S. Jan. 5, 2009). Like the Court's decision, the Conference's brief discounted the prospect that recognizing a violation of due process in *Caperton* would open the floodgates to disqualification challenges. The Conference argued that "[a] due process review of a challenged failure to recuse would be limited to cases of extraordinary support" and that the Conference itself was aware of only two other cases that presented facts as extreme as *Caperton. Id.* at *23.

¶27 We agree with Dr. Tatham that the disqualification issue presented in this case does not fall within any of the "extraordinary situation[s]" where the United States Supreme Court has found the Constitution to require recusal. *Caperton*, 556 U.S. at 887. It does present issues under Washington's appearance of fairness doctrine, however.

*Appearance of Fairness Doctrine*

¶28 Washington cases have long recognized that judges must recuse themselves when the facts suggest that they are actually or potentially biased. *See Diimmel v. Campbell*, 68 Wn.2d 697, 699, 414 P.2d 1022 (1966) ("It is incumbent upon members of the judiciary to avoid even a cause for suspicion of irregularity in the discharge of their duties."). In *State ex rel. McFerran v. Justice Court of Evangeline Starr*, 32 Wn.2d 544, 548, 202 P.2d 927 (1949), the court stated that "[t]here can be no question but that the common law and the Federal and our state constitutions guarantee to a defendant a trial before an impartial tribunal, be it judge or jury." It quoted the court's 1898 decision in *State ex rel. Barnard v. Board of Education* for its observation that " '[t]he principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of courts.' " *Id.* at 549 (quoting *State ex rel. Barnard v. Bd. of Educ.*, 19 Wash. 8, 17, 52 P. 317 (1898)).

¶29 In *State v. Madry*, the court held, " 'Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.' " 8 Wn. App. 61, 68, 504 P.2d 1156 (1972) (quoting *Murchison*, 349 U.S. at 136). Citing to the then-recently-enacted canons of the CJC of the American Bar Association, the court stated:

> The appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of bias or prejudice. The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial. Next in importance to rendering a righteous judgment is that it be accomplished in such a manner that it will cause no reasonable questioning of the fairness and impartiality of the judge. A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned.

*Id.* at 70. Within a year following the decision in *Madry*, our Supreme Court adopted the CJC by order dated October 31, 1973, effective on January 1, 1974, to supersede the Canons of Judicial Ethics that had been effective since January 2, 1951. *See* 1 WASHINGTON COURT RULES ANNOTATED 77 (2d ed. 2009-10).

¶30 Beginning with *State v. Post*, 118 Wn.2d 596, 826 P.2d 172, 837 P.2d 599 (1992), the Supreme Court has characterized a judge's failure to recuse himself or herself when required to do so by the judicial canons as a violation of the appearance of fairness doctrine.[4] The court also narrowed the scope of the appearance of fairness doctrine from one under which a party could challenge whether decision-making *procedures* created an appearance of un-fairness to a reformulated threshold: whether there is "evidence of a judge's or decisionmaker's actual or potential bias." *Id.* at 619 n.9.

¶31 Under the version of the CJC in effect at the time of the trial below, "[j]udges should disqualify them-selves in a proceeding in which their impartiality might reasonably be questioned," including but not limited to instances in which "the judge has a personal bias or prejudice concerning a party." Former CJC Canon 3(D)(1)(a) (2002). While the CJC in effect at the time of trial did not extend the judge's duty of disqualification to proceedings where the judge has a personal bias or prejudice concerning

---

[4] The appearance of fairness doctrine was first enunciated in *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969). *Harris v. Hornbaker*, 98 Wn.2d 650, 659 n.2, 658 P.2d 1219 (1983). As originally applied, it extended procedural protections typical of adjudicatory proceedings to quasi-judicial proceedings. It also permitted inquiry into the motives and interests of decision makers in quasi-judicial proceedings, including by extending rules of disqualification that apply to judges under former CJC Canon 3(C) (1976) to rezoning and other agency decisions that are essentially adjudicatory. *Id.* at 664-65 (Utter, J., concurring). The appearance of fairness "doctrine," as such, was not viewed as applying to judicial proceedings. Carolyn M. Van Noy, Comment, *The Appearance of Fairness Doctrine: A Conflict in Values*, 61 WASH. L. REV. 533, 534 n.10 (1986) ("Judicial procedures are reviewed under the WASHINGTON STATE CODE OF JUDICIAL CONDUCT, therefore, the appearance of fairness doctrine does not apply.").

a party's *lawyer*, as it does now,[5] an advisory ethics opinion issued in 1990, which Mr. Rogers submitted in support of his motion for relief from the judgment, required that a judge disclose past associations that might reasonably suggest or create a conflict of interest. The 1990 ethics opinion provides, in pertinent part:

> A judge is required to disclose to the parties on the record any known past association with a law firm or attorney which would lead a reasonable person to infer that the judge is partial or that there is a potential for a conflict of interest. Absent such circumstances, the fact that at some earlier time the judge was affiliated with the law firm or office, or that a member of the firm is or was affiliated with a law firm or office in which the judge formerly practiced, does not require disclosure on the record. The judge is required to disclose on the record when an attorney appearing in court or who has signed pleadings worked directly with the judge before the judge assumed the bench.

Wash. Ethics Advisory Comm., Op. 90-14 (1990).

¶32 Like the protections of due process, Washington's appearance of fairness doctrine seeks to prevent the problem of a biased or potentially interested judge. *State v. Carter*, 77 Wn. App. 8, 12, 888 P.2d 1230 (1995). Under this doctrine, evidence of a judge's actual bias is not required; it is enough to present evidence of a judge's actual or potential bias. *Post*, 118 Wn.2d at 619 n.9. "The CJC recognizes that where a trial judge's decisions are tainted by even a mere suspicion of partiality, the effect on the public's confidence in our judicial system can be debilitating." *Sherman v. State*, 128 Wn.2d 164, 205, 905 P.2d 355 (1995).

---

[5] The current version of the CJC identifies the circumstances in which a judge's impartiality might reasonably be questioned as including when "[t]he judge has a personal bias or prejudice concerning a party *or a party's lawyer*." CJC 2.11(A)(1) (emphasis added). It also provides, "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, *even if the judge believes there is no basis for disqualification*." CJC 2.11 cmt. 5 (emphasis added). This comment did not exist at the time of trial.

¶33 A judicial proceeding satisfies the appearance of fairness doctrine only if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing. *Bilal*, 77 Wn. App. at 722. "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that 'a reasonable person knows and understands all the relevant facts.'" *Sherman*, 128 Wn.2d at 206 (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988)). Because the trial court is presumed to perform its functions regularly and properly without bias or prejudice, *Wolfkill*, 103 Wn. App. at 841, "[a] party asserting a violation of the [appearance of fairness] doctrine must produce sufficient evidence demonstrating bias, such as personal or pecuniary interest on the part of the decision maker; mere speculation is not enough." *In re Pers. Restraint of Haynes*, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000).

## Timeliness of Assertion and Waiver

¶34 Judge Verser rejected Mr. Rogers' CR 60(b) motion principally on the basis that Mr. Rogers waived his due process and appearance of fairness claims because, the judge asserted, Mr. Rogers' attorneys knew of the facts supporting the CR 60(b) motion long before the motion was made.

¶35 "[A] litigant who proceeds to trial knowing of potential bias by the trial court waives his objection and cannot challenge the court's qualifications on appeal." *In re Welfare of Carpenter*, 21 Wn. App. 814, 820, 587 P.2d 588 (1978). A party may not speculate upon what rulings the court will make on propositions involved in the case and, if the rulings do not happen to be in the party's favor, then for the first time raise the issue on appeal. *Id.* These and other cases that Dr. Tatham cites as supporting the trial court's finding of waiver all depend on a demonstration that the

waiving party knew of the grounds requiring recusal before the complained-of determination. The burden of establishing a waiver is upon the party asserting that the right has been waived. *Cf. State v. Ashue,* 145 Wn. App. 492, 502, 188 P.3d 522 (2008) (recognizing that the burden to establish a valid waiver of a constitutional right is upon the prosecution).

¶36 Without conducting an evidentiary hearing, Judge Verser summarily concluded that "there's no question [Mr. Rogers' attorneys] knew everything . . . pertinent to a possible recusal, except possibly the power of attorney, which was never used, so it really doesn't make any difference." RP (June 18, 2010) at 40. He asserted that the relationships and incidents raised by Mr. Rogers were "widely known in the community, published repeatedly in local papers," and/or "a matter of public record for years." CP (Sept. 9, 2010) at 230. But while Judge Verser evidently sensed that his and Ms. Bierbaum's associations and dealings were a matter of keen public interest and would be recalled several years after the fact by lawyers practicing in Jefferson County, we see no reason why that would be so. Judge Verser identified nothing in the record that contradicts Mr. Rogers' declaration that he was unaware of the facts giving rise to the present motion until after he hired a private investigator in August 2009, nor does the record include evidence that Mr. Rogers' attorneys were previously aware of the facts giving rise to the motion. The judge's and Ms. Bierbaum's statements about what Mr. Rogers' lawyers knew are not evidence; neither offered any foundation for their assertions. *See* ER 605 (the judge presiding at trial may not testify as a witness); ER 602 (witness may testify only to matters as to which the evidence is sufficient to establish his or her personal knowledge).[6] It is an abuse of discretion to rely for decision on unsupported facts.

---

[6] The courtroom plaque does not satisfy the ethical requirement for disclosure "on the record." Ethics Advisory Op. 90-14; *and cf.* CJC 2.11 cmt. 5. And even if well intentioned, it may frustrate the purpose behind the disclosure requirement more than advancing it, since it makes no distinction between relationships that

¶37 In an effort to support Judge Verser's conclusion on appeal, Dr. Tatham points to newspaper articles reporting on the DUI incident. But as Mr. Rogers points out, of the 10 articles submitted by Dr. Tatham in opposition to the motion for relief from the judgment—8 from the *Port Townsend & Jefferson County Leader* and 2 published in the *Peninsula Daily News*—only 1, an article published in the June 30, 2004 edition of the *Port Townsend & Jefferson County Leader*, made any mention of Ms. Bierbaum having been present or involved the night of the judge's arrest. The proof that one 2004 article mentioned the incident does not establish that Mr. Rogers or his lawyers ever saw the article or, if they did, that they remembered it.[7]

¶38 Beyond that, Dr. Tatham encourages us to doubt the contention by Mr. Rogers that he did not know of the allegedly disqualifying facts. Resp't's Br. (May 3, 2011) at 17 ("neither of Rogers' trial counsel has denied that he had actual knowledge"), 18 ("this Court should view with skepticism Roger[s'] claim that he had no knowledge" and "[i]t is difficult, if not impossible, to believe that Rogers acquired no information about any potential basis for disqualification"). Individually and collectively, Dr. Tatham's evidence, the arguments she makes, and the trial court's assumptions about what was known by Mr. Rogers and his attorneys fail to meet Dr. Tatham's burden of demonstrating waiver.

¶39 Dr. Tatham argues alternatively that the CR 60(b) motion was untimely given the nine-month lapse between Mr. Rogers' hiring of a private investigator in August 2009 and his filing of the CR 60(b) motion the following May, after he filed the brief in his initial appeal of the distribution decision. A "reasonable time" within which to bring the motion under the rule is determined by the

would come nowhere near requiring recusal and others that could be of legitimate concern.

[7] Because the record includes no evidence that Mr. Rogers' lawyers knew of the associations and incidents on which Mr. Rogers relies for his challenge, we need not reach the contested issue of whether the lawyers' knowledge, standing alone, would be sufficient to establish waiver of a disqualifying bias or prejudice.

facts and circumstances of the case, and major factors that should be considered include prejudice to the nonmoving party and whether the moving party has good reasons for the delay in filing. *Luckett v. Boeing Co.*, 98 Wn. App. 307, 312-13, 989 P.2d 1144 (1999). Dr. Tatham has not demonstrated any prejudice. Mr. Rogers had already moved for reconsideration and filed his notice of appeal before he learned of the grounds for the posttrial motion; it was already clear to Dr. Tatham that she could not be sure of the finality of the trial court's disposition until the appeal was concluded. Given the absence of any prejudice to Dr. Tatham, it is reasonable that Mr. Rogers and his lawyers would believe that they would best advance the ultimate finality of the property disposition by addressing their attention first to the appeal of right before following up on the results of Mr. Rogers' posttrial investigation with a challenge on the basis of the trial judge's partiality.

*CR 60(b) as a Basis for Challenging, Posttrial, a Failure To Recuse or Disclose*

¶40  CR 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . for the following reasons:

. . . .

(5) The judgment is void;

. . . .

(11) Any other reason justifying relief from the operation of the judgment.

Both grounds were relied upon by Mr. Rogers in moving for relief from the judgment. CP (Sept. 9, 2010) at 16.

¶41  When a court disregards a person's due process rights, the resulting judgment is void. *In re Marriage of Ebbighausen*, 42 Wn. App. 99, 102, 708 P.2d 1220 (1985). But in this case only the appearance of fairness was

violated, not due process. We conclude that CR 60(b)(11), rather than CR 60(b)(5), is the proper basis for seeking relief from a judgment for a violation of the appearance of fairness that comes to light after judgment is entered. This accords with *City of Bellevue v. King County Boundary Review Board*, in which the court observed that "[o]ur appearance of fairness doctrine, though related to concerns dealing with due process considerations, is not constitutionally based," 90 Wn.2d 856, 863, 586 P.2d 470 (1978), and elsewhere that CR 60(b) would be the appropriate procedural vehicle for vacating a judgment in a civil suit based on later discovery of facts that call into question the impartiality or fairness of the action. *Id.* at 864.

■ ■ ¶42 CR 60(b)(11) is, like rule 60(b)(6) of the Federal Rules of Civil Procedure, the catchall provision by which the courts may vacate judgments for reasons not identified in the rule's more specific subsections.[8] Washington courts turn to federal courts for guidance in determining the scope of the catchall provision when faced with a circumstance not previously addressed in Washington decisions. *Barr v. MacGugan*, 119 Wn. App. 43, 47, 78 P.3d 660 (2003) (looking to federal decisions on lawyer mental illness or disability as a basis for relief from judgment under the catchall provision). As with its federal counterpart, subsection (b)(11) of CR 60 applies only in situations involving "extraordinary circumstances" relating to " 'irregularities which are extraneous to the action of the court or go to the question of the regularity of its proceedings.' " *Flannagan*, 42 Wn. App. at 221 (internal quotation marks omitted) (quoting *State v. Keller*, 32 Wn. App. 135, 141, 647 P.2d 35 (1982)).

¶43 The United States Supreme Court has held that a challenge to a decision based on a trial court's failure to disqualify itself as required by the controlling judicial code is just this type of irregularity. In *Liljeberg v. Health*

---

[8] Fed. R. Civ. Proc. 60(b)(6) provides that a federal district court may relieve a party "[o]n motion and just terms" for "any other reason that justifies relief."

*Services Acquisition Corp.*, 486 U.S. 847, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988), the Supreme Court reviewed the refusal of a trial court judge to recuse himself where the basis for recusal relied upon was a provision of the federal judicial code rather than a violation of due process. Health Services Acquisition Corp. (HSA) and John Liljeberg had litigated competing claims to ownership of a corporation, St. Jude, which held a certificate of need to construct a hospital. HSA had actually applied for and secured the certificate after acquiring title to St. Jude (or so it thought) from Liljeberg. Liljeberg claimed that he retained title and had entered into a contract giving rights to the certificate to Loyola University. The federal district court judge presiding over the dispute served as a trustee of Loyola University at relevant times, but HSA did not learn of the judge's indirect interest in Liljeberg's right to the certificate until it had lost in the district court and in the Fifth Circuit Court of Appeals.

¶44 HSA moved for relief from the judgment under rule 60(b)(6) 10 months after it lost its appeal. The Court of Appeals held that the district court judge should have recused himself. *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 801 (5th Cir. 1986). The Supreme Court granted certiorari and addressed two questions: "whether [28 U.S.C.] § 455(a) can be violated based on an appearance of partiality . . . and second, whether relief is available under Rule 60(b) when such a violation is not discovered until after the judgment has become final." *Liljeberg*, 486 U.S. at 858.

¶45 28 U.S.C. § 455(a) is the provision of the federal judicial code that deals with judicial disqualification. The Court observed it was amended in 1974 to broaden the grounds for judicial disqualification to conform to ABA CJC Canon 3C. 486 U.S. at 858 n.7. As amended, it provides:

> Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

28 U.S.C. § 455(a). While the statute defines the circumstances that mandate disqualification of federal judges, it does not identify any remedy for violation of the duty, "wisely delegat[ing] to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation," according to the Court. 486 U.S. at 862.

¶46 The Court determined that the basis for relief where a district court fails to comply with the judicial code is extraordinary, bringing the motion within the catchall provision of rule 60(b). *Id.* at 863 n.11. In that connection, it observed that in such a case there is not neglect by the moving party, but by the judge, if he or she fails to inform the parties of an association or interest that should have been disclosed. *Id.*

¶47 To determine whether a judgment should be vacated for a violation of the judicial code, the Court held it was appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. *Id.* at 864. As to the risk of undermining the public's confidence in the judicial process, it stated, "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety wherever possible." *Id.* at 865. And addressing the risk that a denial of relief will produce injustice in other cases, it held:

> [T]o the contrary, the Court of Appeals' willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.

*Id.* at 868. Thus analyzed, the two risks external to the dispute will favor providing relief whenever courts are charged by statute, common law, or other authority to recuse or obtain an informed waiver if circumstances suggest partiality. Whether a party is entitled to relief from

judgment will therefore usually turn on whether there is a risk of injustice to the parties in the particular case if relief is not granted.

¶48 In light of our Supreme Court's decision in *City of Bellevue*, our reliance on federal courts for guidance in construing the scope of CR 60(b)(11), and the sound reasoning of *Liljeberg*, we hold that a motion for relief from a judgment under CR 60(b)(11) is an appropriate procedure for raising a posttrial challenge based on a violation of the appearance of fairness doctrine, and whether relief should be granted turns on the risk of injustice to the parties in the particular case if relief is not granted.

### *The Trial Court Erred by Denying Mr. Rogers' CR 60(b) Motion*

¶49 Mr. Rogers demonstrated a violation of the appearance of fairness doctrine. The associations and events relied upon by Mr. Rogers as requiring recusal demonstrate that Judge Verser and Ms. Bierbaum have had, in the past, a relationship of mutual trust and reliance. Standing alone, the past professional relationship between the judge and Ms. Bierbaum and the personal and political dealings between them during that relationship and in the several years that followed would probably not require the judge's disqualification, although they still required disclosure.[9]

¶50 But Judge Verser's continuing service as Ms. Bierbaum's attorney-in-fact, second only to her husband, under a durable power of attorney broadly authorizing him to "have all of the powers of an absolute owner" as to her assets and liabilities is critical both because of its nature and its currency. CP (Sept. 9, 2010) at 68. Dr. Tatham argues, as Judge Verser earlier asserted, that the appointment was prepared for use only in connection with a one-time real estate transaction and has never been acted

---

[9] As noted earlier, they would even more clearly require disclosure under the current version of the CJC. *See supra* note 5.

upon. That may be so. But by its terms it is not limited in any way. It was never revoked. The appointment was accepted in disregard of the version of the CJC in effect at the time of his appointment and is clearly prohibited by the current version.[10]

¶51 The issue for a judge in considering whether the appearance of fairness doctrine may be or has been violated is not whether he or she personally and in good faith views a family relationship, for example, or a financial interest, or a fiduciary relationship, to be of little significance. It is whether, in light of the relationship, a reasonably prudent and disinterested person would conclude that all parties can or did obtain a fair, impartial, and neutral hearing. In considering Mr. Rogers' motion, it was incumbent on the court to recognize that by its terms, the durable power gave him (and had given him for several years) virtually complete authority to handle Ms. Bierbaum's affairs, albeit upon a contingency.

¶52 Mr. Rogers also demonstrated the required risk of injustice to the parties if relief is not granted. In *Liljeberg,* the United States Supreme Court evaluated this risk by examining whether "there is a greater risk of unfairness in upholding the judgment . . . than there is in allowing a new judge to take a fresh look at the issues." 486 U.S. at 868. In this connection, it considered whether the moving party's evidence presented a reasonable concern that the trial judge was partial and whether the responding parties had made a showing of special hardship by reason of their reliance on the judgment. *Id.* at 868-69.

¶53 The highly discretionary nature of a trial court's task in deciding property distribution matters amplifies the

---

[10] "Judges shall not serve as executors . . . or other fiduciaries, except for the estate, trust or person of members of their families, and then only if such service will not interfere with the proper performance of their judicial duties." Former CJC Canon 5(D) (1995). Judge Verser claimed that the appointment "[did not] make any difference" because he never had to act on it. RP (June 18, 2010) at 40. This provision was recently amended to expressly prohibit a judge from *accepting an appointment* to serve as an attorney-in-fact for a nonfamily member. CJC 3.8(A).

prejudice in this case. In *State v. Carlson*, 66 Wn. App. 909, 919-20, 833 P.2d 463 (1992), in which a party belatedly challenged the partiality of one member of a three-judge appellate panel, Division One of our court made the following observations about the different potential for prejudice depending on the tribunal and the discretionary or nondiscretionary nature of its decision making:

> [I]n the appellate system no one judge controls a 3-judge panel. When . . . the panel is unanimous, a litigant is protected by the fact that two other judges have agreed with the decision. . . . [D]ecisions in the Court of Appeals almost exclusively involve legal issues with very little room for the exercise of discretion. Appellate judges are required to issue written opinions which are subject to objective examination and review. In contrast, there is vast discretion vested in a trial judge and often no reasons need be given for the exercise of such discretion. Accordingly, it might often be difficult to tell whether any improper motive entered into a trial court's decision.

*Cf. Carter*, 77 Wn. App. at 16 (Sweeney, J., dissenting) (noting that the "enormous discretion" of the trial judge in conducting a criminal trial, whose discretionary decisions are reversible only for abuse, heightens the prejudice presented in case of bias). By comparison, were a party to seek to vacate a judgment granted as a matter of law under CR 50 or 56, prejudice would be doubtful, given that review on appeal would be de novo. *Cf. State v. Chamberlin*, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007) (reasoning that the appearance of fairness doctrine is not violated where a suppression hearing is heard by the same judge who authorized the search warrant, noting that "[a]ppellate courts review de novo the legal conclusion of law whether probable cause is established").

¶54 A property distribution proceeding before a single superior court judge presents the height of discretion, with the court required to make a just and equitable distribution of community-like property guided by the laws related to the distribution of marital property. *Connell v. Francisco*,

127 Wn.2d 339, 348-49, 898 P.2d 831 (1995). We and other appellate courts have frequently cited our Supreme Court's explanation in *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985) that

> trial court decisions in a dissolution action will seldom be changed upon appeal. Such decisions are difficult at best. Appellate courts should not encourage appeals by tinkering with them. The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court. The trial court's decision will be affirmed unless no reasonable judge would have reached the same conclusion.

(Citations omitted.) Given this standard of review, a division of community or community-like property tainted by a judge's partiality will evade correction on appeal unless no reasonable judge would have reached the same conclusion.

¶55 The disproportionate distribution of the parties' community-like property to the younger, healthier party in this case raises further concerns of possible prejudice, although we need not and do not decide whether a party must demonstrate a facially anomalous result to show prejudice. Finally, Dr. Tatham has not made a showing of any special hardship by reason of her reliance on the original judgment. *Cf. Liljeberg*, 486 U.S. at 869.

¶56 There was considerable discussion in the trial court about the unique problems presented for superior courts that, like Jefferson County, are served by a single judge when held to the same requirements for disclosure and recusal as are applied to judges in more populous counties. In single-judge counties, a judge is likely to have had business and personal relationships with a higher proportion of lawyers practicing in the court and the inconvenience will be greater if recusal is required. Nonetheless, the legislature saw fit to make only one minor distinction in enacting the affidavit of prejudice procedure provided by RCW 4.12.050, requiring that "in counties where there is

but one resident judge, [the motion and affidavit establishing prejudice] shall be filed not later than the day on which the case is called to be set for trial." A party who knows of circumstances raising a concern of partiality in a single-judge county therefore has a statutory right to establish prejudice by affidavit under RCW 4.12.050. How can one reasonably contend that convenience for the court justifies keeping other parties in the dark? And nothing in the history of the appearance of fairness doctrine in Washington decisions or the CJC supports treating parties' rights to fair procedure differently based on the relative inconvenience to the court of assigning a case to another judge.

¶57 Mr. Rogers has demonstrated a greater risk of unfairness in upholding the judgment in this case than there is in allowing a new judge to take a fresh look at the issues.

## III

¶58 Dr. Tatham requests attorney fees due to Mr. Rogers' alleged noncompliance with RAP 10.3(a)(5) and RPC 8.2(a) in his opening brief regarding the recusal matter. We construe her argument as a request for sanctions under RAP 18.9(a). We find no violation of the rules and deny the request.[11]

¶59 Having determined that Mr. Rogers is entitled to a new trial before a different judge, we do not reach his assignments of error to the findings, conclusions, and judgment distributing the parties' property.

---

[11] Several motions made during the course of the appeal were referred to the panel. Mr. Rogers filed a June 30, 2011 motion to present additional evidence on appeal relating to a sanctions issue raised by Dr. Tatham and an August 3, 2011 motion for acceptance of a reply in support of that motion. We decline to consider the sanctions issue and deny Mr. Rogers' two motions as moot. Mr. Rogers' second, December 13, 2011 motion to supplement the record with a clearer photograph of the plaque in Judge Verser's courtroom is granted.

¶60 We reverse the challenged provisions of the judgment and remand for proceedings consistent with this opinion.

SWEENEY, J., concurs.

¶61 KORSMO, C.J. (dissenting) — The thoughtful majority opinion sets forth the proper legal standard, but this case turns on James Rogers' failure to prove his allegation. Given appellant's failure to provide any evidence from his trial counsel, the trial court had an ample reason to reject the claim. There was no abuse of discretion. I respectfully dissent.

¶62 Three different local attorneys represented Mr. Rogers. Mr. Steven L. Olsen represented Mr. Rogers through trial and the filing of the initial appeal. He was then replaced by current counsel, all of whom hail from outside Jefferson County. New counsel then pursued the motion to vacate the judgment based on an investigation initiated by Mr. Rogers, pro se. The evidence in support of the motion consisted of affidavits from Mr. Rogers, the private investigator, and new counsel. Noticeably missing are affidavits from any of the local attorneys who represented Mr. Rogers. The only evidence from any of them is some hearsay in new counsel's affidavit relating statements attributed to Mr. Olsen. Clerk's Papers (Sept. 9, 2010) (CP) at 178.

¶63 The affidavit of Mr. Rogers is also rather circumspect in addressing the historical questions, still relevant here, of "what did he know?" and "when did he know it?" The affidavit says that if he had known about the judge's past relationship with opposing counsel (Peggy Ann Bierbaum) when Dr. Tatham "first filed suit against me," he would have sought a new judge. CP at 34, 35. Critically, he does not relate any information about what his various trial attorneys knew and may or may not have told him, nor does he directly identify when he first learned of the past relationship between opposing counsel and the judge.

¶64 This evidence, understandably, was not persuasive to Judge Craddock Verser. The judge stated that all three of the local attorneys who represented Mr. Rogers knew the same facts, with the exception of those related to the power of attorney.[12] "That's the way it is when you practice in a small town." Report of Proceedings (June 18, 2010) at 36. The judge also spoke at length of his three-decade-long friendship with Mr. Olsen, the person who had helped him and his family get started when they moved to Jefferson County. *Id.* at 33-38.

¶65 The majority decries these comments, observing they are not proof that Mr. Rogers' local attorneys knew these facts. Majority at 97. While true, the majority's observation misses the point. It was Mr. Rogers' burden to establish what he knew and did not know, and when he knew. Due to the attorney-client privilege, he was the only one who could provide evidence from his attorneys. He made no effort to do so, even though new counsel clearly spoke with Mr. Olsen about the matters. He also provided no evidence about what information, if any, his attorneys provided him. Again, he was the only one in a position to do so.

¶66 The knowledge of an attorney is imputed to the client. *Hill v. Dep't of Labor & Indus.*, 90 Wn.2d 276, 279, 580 P.2d 636 (1978) (citing *Yakima Fin. Corp. v. Thompson*, 171 Wash. 309, 318, 17 P.2d 908 (1933); *Stubbe v. Stangler*, 157 Wash. 283, 288 P. 916 (1930)). Similarly, the court and other parties are justified in relying upon an attorney's authority to act in the client's best interests until the client had terminated the representation and advised the court and counsel. *E.g.*, *Haller v. Wallis*, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978); *Russell v. Maas*, 166 Wn. App. 885, 889, 272 P.3d 273, *review denied*, 174 Wn.2d 1016 (2012); *Engstrom v. Goodman*, 166 Wn. App. 905, 916, 271 P.3d 959

---

[12] While this appointment certainly established that Ms. Bierbaum trusted Judge Verser, it does not establish the converse proposition that the judge trusted her. Instead, it simply showed his willingness to act on her behalf if necessary.

(2012), *petition for review filed*, No. 87386-1 (Wash. May 17, 2012). The attorney's actions are binding upon the client. *Haller*, 89 Wn.2d at 547-48; *Russell*, 166 Wn. App. at 889-90; *Engstrom*, 166 Wn. App. at 916. Attorney Olsen let the case proceed to trial before Judge Verser.[13] That action was binding upon Mr. Rogers.

¶67 Therefore, if Mr. Rogers thought that a personal relationship rendered his trial unfair, he had to do more than show that he personally was unaware of the alleged relationship.[14] He also had to show that his attorney, who allowed the matter to go to trial before the judge, did not know. Mr. Rogers made no effort to do that. The trial court understandably rejected the motion.[15]

¶68 This case is in many respects similar to an allegation of ineffective assistance of counsel raised in a personal restraint petition. A person who contends his counsel did or did not tell him something bears the burden of proving that point. Mere allegations from the petitioner are insufficient. *E.g.*, *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886-87, 828 P.2d 1086 (1992). Similarly here, when a party complaining about an action taken by his counsel does not present evidence from the attorney, I would hold the evidence insufficient as a matter of law and affirm the trial court on that basis.[16]

---

[13] Although the statutory opportunity to change judges had been lost prior to attorney Olsen's entry into the case due to earlier discretionary rulings by Judge Verser, RCW 4.12.050(1), counsel was still able to file a motion to recuse if he believed one appropriate.

[14] Even if there was only need to show that the client was unaware, Mr. Rogers did not make that showing here. The carefully worded affidavit filed in this case never stated when he actually became aware of the alleged relationship and never indicated whether he and counsel discussed the topic.

[15] The trial court could have reached the same result by use of the missing witness inference. *E.g.*, *Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 352, 109 P.2d 542 (1941).

[16] Indiana permits an inference that counsel would not have corroborated the habeas corpus petitioner's allegations when the petitioner fails to at least attempt to obtain evidence from the attorney. *Van Evey v. State*, 499 N.E.2d 245, 248 (Ind. 1986); *Lenoir v. State*, 267 Ind. 212, 214, 368 N.E.2d 1356 (1977).

¶69 Although not dispositive here, I do disagree with one other statement in the majority's analysis. While discussing proof of prejudice, the majority states:

> The disproportionate distribution of the parties' community-like property to the younger, healthier party in this case raises further concerns of possible prejudice, although we need not and do not decide whether a party must demonstrate a facially anomalous result to show prejudice.

Majority at 106. I disagree that the unequal distribution of the community-like property raises any concerns in this case.[17]

¶70 The primary issue presented by the original appeal, but not decided in light of the majority's ruling on the CR 60(b) appeal, was whether a trial court can consider the separate property of the parties when making an equitable distribution of community-like property. Only the community-like property is before a court for distribution following the conclusion of a committed intimate relationship. *Connell v. Francisco*, 127 Wn.2d 339, 349, 898 P.2d 831 (1995). From this premise, Mr. Rogers argues that the trial court could not consider the existence of separate property in distributing the community-like property.

¶71 I disagree with that argument. It is difficult to discern how a trial court could make an equitable distribution of community-like property without knowing the resources of the parties, including their separate property. The extent of separate property is considered when distributing community property in a marriage dissolution proceeding. RCW 26.09.080(2). It should be a factor considered when distributing community-like property as well.

¶72 Thus, there was no inference of prejudice to be drawn from the unequal distribution of the community-like property in this case. Not only was nearly the entire

---

[17] The statement should be read in the context of Mr. Rogers' bias argument and should not be read as an indication of the majority's view of this factor when equitably distributing community-like property.

community-like property the result of Dr. Tatham's earnings during the relationship, but it would be completely unfair to ignore the fact that she had practically no separate property and Mr. Rogers had more than $1,300,000 in separate property. If not considering the separate estates, what factors could a trial court rely upon when distributing the community-like property? How could the court consider the needs of the parties without consideration of their economic resources? *Cf.* RCW 26.09.080(4) (directing court in marriage dissolution to consider the economic circumstances of the parties).

¶73 Because the trial court had authority, if not an outright duty, to consider the separate property of the parties when distributing the community-like property, the majority errs in suggesting a disparate distribution of the latter could indicate prejudice against a party. If the family home is sought by both parties, does giving it to one of them suggest bias against the other? The answer is, emphatically, "No." One must look at the entire distribution scheme before discerning potential bias. The majority's focus on one segment of the entire picture erroneously distorts the view of the whole. On its own, it does not suggest prejudice.

¶74 This appeal came about because a disgruntled litigant, unhappy with ending up with three times as much property as his former partner, decided to attack the decision maker. Unable to find the "dirt" he assumed he would find, the litigant then focused on the judge's former relationship with opposing counsel and ignored his own counsel's relationship with the judge. Unless a judge in a small community was a hermit or a newcomer to the region (neither of which is a good foundation for the position) before assuming the bench, the judge will necessarily have had relationships—business or personal—with most of the attorneys in the community. That is not necessarily a bad thing. Those relationships will also be known to most members of the bar, either through direct experience or from disclosure in other cases. It is not inappropriate for a

trial judge to consider those facts—whether raised by the litigant or not—when ruling on a motion to recuse.

¶75 The majority errs in finding persuasive that which the trial court found unpersuasive. It also errs by suggesting prejudice could result from a portion of a judge's broader property distribution ruling. For both reasons, I respectfully dissent.