# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 56349-5-II |
| KIMBERLEY A. CHANDLER, | |
| Appellant, | |
| v. | |
| WILLIAM J. CHANDLER, | UNPUBLISHED OPINION |
| Respondent, | |

LEE, J. — Kimberley A. Chandler appeals the trial court's 2021 final order and parenting plan entered after she petitioned for a major modification of a 2018 parenting plan between her and William J. Chandler. Kimberley[1] argues that the trial court erred by (1) removing the statutory presumption in favor of relocation that chapter 26.09 RCW grants to the primary residential parent even though the trial court had determined that the relocation issue was not properly before it, (2) ordering that future unfounded reports to Child Protective Services (CPS) by Kimberley or at her instigation would lead to the termination of her rights under the order, (3) failing to incorporate the 2018 parenting plan's finding that CPS upheld findings of physical and sexual abuse against William into the new 2021 parenting plan, (4) granting a minor modification of the parenting plan in favor of William, and (5) requiring Kimberley and William to engage in conduct prohibited by a Thurston County Domestic Violence Protection Order. Finally, Kimberley argues that should

---

[1] Because the parties in this case have the same last name we refer to them by their first names for clarity. No disrespect is intended.

this case be remanded to the trial court for more discretionary rulings, this case should be reassigned to a different trial judge.

We hold that the trial court erred by ordering that neither parent would have the statutory presumption in favor of relocation and by ordering that future unfounded reports by Kimberley or at her instigation to CPS would lead to the termination of her rights under its final order.  We reject the remainder of the Kimberley's arguments.  Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

FACTS

A.    2018 PARENTING PLAN

William and Kimberley separated in 2016.  They share three daughters: K.S., born September 2, 2004; E.C., born July 9, 2009; and P.C., born June 1, 2012.  Soon after the couple's separation, K.S. reported that William had sexually and physically abused her.  E.C. also reported that William had sexually abused her.  The allegations made by K.S. and E.C. were reported to CPS.  In 2017, CPS conducted an investigation and made a finding that the accusations were founded.  Subsequently, CPS reviewed the finding of sexual abuse and upheld it.

In October 2018, a Pierce County Superior Court judge entered a parenting plan pertaining to the three children.  The 2018 parenting plan provided for joint decision-making by Kimberley and William on major decisions.  The residential provisions of the parenting plan provided that Kimberley would have the children the majority of the time.  Notwithstanding the allegations of sexual abuse made against William by the children, the 2018 parenting plan provided for William to have residential time with E.C. and P.C. through a series of graduated phases.  Section 8.b. of the 2018 parenting plan outlined the time that William would have with E.C. and P.C., stating:

1.  The second Saturday after entry of this order and then every other Saturday from 10:00 AM until 6:00 PM and every other Sunday from 10:00 AM until 5:00 PM (on the same weekend) for a total of six weekend visitations.

2.  After 8. b. 1. above is completed, every other Saturday from 10:00 AM until Sunday at 5:00 PM for a total of six weekend overnight visitations.

3.  After 8. b. 2. above is completed, every other Friday at 6:00 PM until Sunday at 5:00 PM.

Clerk's Papers (CP) at 3. The 2018 parenting plan provided that William would maintain this schedule during the summer except that "each parent shall spend two weeks of uninterrupted vacation time with the children each summer." CP at 4. The court explained in a finding why no limitations were placed on William under RCW 26.09.191 even though reasons for limitations existed.

After an investigation, allegations that the father sexually and physically abused one daughter and sexually abused another daughter were deemed founded by CPS. Those findings were subsequently upheld upon further review by CPS. The father denied all allegations. After months of professionally-supervised and lay-supervised visitation, the parties, with the help of counseling and in the interest of moving forward in the best interests of the children, have agreed to a parenting plan that slowly provides for increasing residential time for the father.

CP at 2. Pursuant to the parenting plan, K.S. would not have visitation with William until a reunification counselor recommended that she should.

In July 2019, the Pierce County Superior Court overturned the 2017 founded finding made by CPS. Because of the superior court's ruling, CPS's founded finding of abuse was altered to no finding.[2]

---

[2] Despite there being multiple places in the record showing that CPS's 2017 finding was reversed by the Pierce County Superior Court, Kimberley's briefing does not address the reversal of CPS's finding by the superior court.

B.       DOMESTIC VIOLENCE ORDER FOR PROTECTION

After entry of the 2018 parenting plan, K.S. made "new and additional disclosures of sexual abuse" to counselors she saw at Comprehensive Life Resources. CP at 12. In addition, P.C. drew a picture during counseling that supported that her father had sexually abused her.

In the beginning of February 2020, Kimberley informed William that she planned to obtain an order for protection for herself and the girls. The next time William attempted to pick up E.C. and P.C. for their scheduled weekend, he was unable to do so. As of the time of the trial below in July 2021, William had last seen E.C. and P.C. on February 9, 2020, after a regularly scheduled visit. William last saw K.S. on February 7, 2020.

In February 2020, Kimberley moved for a Domestic Violence Order for Protection (DVPO) in Thurston County Family and Juvenile Court against William. In May 2020, the Thurston County court commissioner granted a one-year protection order, which included the children as protected parties. The commissioner granted the order on the basis that William had stalked Kimberley. The Thurston County order referenced the earlier 2018 parenting plan and provided that William could maintain visitation as stated in that plan. The order prohibited all contact between William and Kimberley, including by telephone or electronic means. It also required William to stay at least 500 feet from Kimberley.

C.       2020 PETITION FOR MODIFICATION

In 2020, both parties moved for a modification of the 2018 parenting plan in Pierce County Superior Court. Kimberley moved for a major modification under RCW 26.09.260(1) and (2), and requested limitations on William's time and participation with the children. In support of her petition, Kimberley stated that the current living situation outlined by the 2018 parenting plan was

4

harmful to the children. Kimberley cited additional disclosures made by her daughters regarding sexual and physical abuse by William as a basis for the modification. The disclosures included "new and additional disclosures of sexual abuse" made by K.S. CP at 12. Kimberley also disclosed that she would like to move to Idaho with her children and fiancé though she did not have a timeline for the move. She stated that she had extended family in Idaho, and her sister and parents also planned to move there. Kimberley did not file or provide the statutorily required notice of intent to relocate at that time.

In September 2020, a Pierce County Superior Court commissioner found adequate cause for Kimberley's petition to modify the parenting plan. The Pierce County commissioner denied William's motion for adequate cause and petition to modify.

In June 2021, Kimberley submitted a proposed parenting plan. Similar to the 2018 parenting plan, Kimberley's proposed plan did not apply to K.S. Kimberley requested limitations on William under RCW 26.09.191. Her reasons included neglect, child abuse, domestic violence, and assault. She also alleged "Other problems" necessitating a change to the parenting plan, including neglect, emotional and physical problems, lack of emotional ties, and abusive use of conflict. CP at 33 (boldface omitted). The proposed plan sought to limit William's time with the children and proposed phased-in visits. For example, during the first phase of the proposed plan, William would be permitted supervised video visits with E.C. and P.C. for no more than one hour per month for six months. The proposed plan also provided that future in-person visits could occur in Idaho and the proposed plan gave all major decision-making authority to Kimberley. Kimberley also filed notice of her intention to relocate. Kimberley again did not provide William with the statutorily required notice of intent to relocate.

In May 2021, Kimberley moved for a renewal of the DVPO in Thurston County Superior Court. Shortly before the hearing on the protection order, CPS made a new founded finding of sexual abuse. At a May 4, 2021 hearing, the Thurston County Superior Court commissioner renewed the order for protection and set its expiration date for May 21, 2022.[3] When the court renewed the protection order, it also required William to surrender firearms and to complete domestic violence treatment.

D.    TRIAL ON MODIFICATION

On July 26, 2021, a three day trial on Kimberley's parenting plan modification and relocation began. At the beginning of trial, the trial court stated that it would not consider Kimberley's motion for relocation, because she failed to provide William the required statutory notice.

The Guardian ad Litem (GAL), Rhiannon Williams, testified that "the children believe[d] that they [had] been abused by their father." 1 Verbatim Report of Proceedings (VRP) (July 26, 2021) at 37. The GAL stated that she met with all three children and conducted individual interviews. During her second in-person visit with E.C., then age eleven, E.C. stated that she wanted to spend time with her father. E.C. also stated, "'I'll just say that I don't want to do visits anymore so Mom is happy, even though I do want to do visits, but my Mom doesn't want me to.'" 1 VRP (July 26, 2021) at 42. Subsequently, Kimberley informed the GAL that E.C. wanted to speak with her. At this third meeting, E.C. told the GAL that she "felt stupid for wanting to see her father again." 1 VRP (July 26, 2021) at 41. E.C. also stated that "her mom was trying to run

---

[3] Kimberley was represented by counsel at the renewal hearing; William was not.

away from a rapist, referring to [William]," and E.C. stated that "her father could have impregnated [K.S.]." 1 VRP (July 26, 2021) at 41.

The GAL acknowledged that hearing an eleven-year-old child speak about a sister becoming pregnant by her father or that her mother was running from a rapist are not things she would expect to hear from an eleven-year-old. The GAL recommended that visitation between William and the children be supervised, for everyone's safety, including William's. She recommended that K.S., for the present, not participate in any visitation with William. The GAL expressed concern about the number of interviews conducted with the children, including interviews with therapists, law enforcement, and CPS. The GAL also testified that between entry of the 2018 parenting plan and her involvement in the case, there were approximately 10 to 11 reports made to CPS concerning William. The information on the name of the person or persons who made the CPS referrals was redacted.

Roxanne Cull, a licensed mental health counselor and mediator, served as a reunification counselor and saw all members of the Chandler family beginning in mid-2018. Cull testified that Kimberley had told her that she did not believe that William abused K.S. In Cull's opinion, Kimberley did not believe that her daughter was sexually abused. Rather, Kimberley was supporting her daughter. Cull had "seen no evidence that . . . [K.S.] was truly sexually abused." 2 VRP (July 27, 2021) at 204.

Cull also testified regarding the incidents involving K.S. The reoccurring incident mentioned by K.S. did not include an act of sexual abuse, but rather an incident that involved William disciplining K.S. after she and her sisters had chased the family's chickens. K.S. was chasing chickens and her father grabbed her by the neck, and beat her back and legs because he

believed she had harmed the chickens. K.S. also reported that her parents made her get rid of her dog when they had to move to a rental because of money issues, and William yelled at K.S. for being upset about the need to get rid of the dog.

Cull also testified that K.S. had told her that after learning in school about inappropriate touching, she realized William had touched her inappropriately. K.S. denied that William touched her vagina, and stated that he had touched her thigh near her underwear, which K.S. thought was inappropriate. In another instance, K.S. revealed that she was in her bed and woke up with a headache and her clothes were folded nearby. K.S. believed the only explanation was that William had hurt her. Cull explained that "kids don't tend to say, you know, 'I was touched inappropriately.'" 2 VRP (July 27, 2021) at 192. She asked K.S. where she had learned this terminology, and K.S. told her she had just taken a class at school and learned what was appropriate and what was inappropriate.

Cull further testified:

> [K.S.] has got this very deep right and wrong, black and white way of thinking.
> Like once she said, "My father touched my breasts," so I said, "Tell me about that." She said: "My father used to come up behind me and hug me. I used to like it, but one time he came up and he hugged me, and I think his hand touched my breast. That was inappropriate."

2 VRP (July 27, 2021) at 192. K.S. acknowledged that she did not believe that William touched her breast on purpose, but stated, "[B]ut he still did it. Even if he did it on accident, he still did it." 2 VRP (July 27, 2021) at 192-93.

Cull observed E.C. and P.C. with their father when no one in the group realized that she was observing. During both times, the children "couldn't get enough of him" as shown by their

interaction with William when they thought no one was observing. 2 VRP (July 27, 2021) at 167. Cull stated that E.C. had told her that "'Mommy told us that we have a new daddy now, and so I'm not supposed to want to come visit this daddy.'" 2 VRP (July 27, 2021) at 168. E.C. also told Cull that her "Mom gets really sad whenever we say we want to see Dad, and she always cries when we go see Dad, and so I don't want to see Dad anymore because it makes Mom cry, and I don't want my mom to cry." 2 VRP (July 27, 2021) at 168. Cull stated that she believed the children had been in too much therapy, stating:

> The fact that these kids—you know, it went from, "No, my father never actually touched me naked," to, "I've been repeatedly raped for years and years."
> I believe that has been damage caused by kids having to talk about this, justify what they have said, combined with a pubescent fantasy life of a child who is hearing things at school, et cetera, et cetera, in between telling me: "I pledged myself to God. I vow to be a virgin when I get married. I'm saving myself for Jesus," because she is very religious, which is fine, but that combined with a bunch of therapists asking her about sex all of the time can be more damaging than helpful.

2 VRP (July 27, 2021) at 173. Cull opined that all the court filings should stop and that Kimberley and William should engage in co-parenting counseling. Cull testified that "[E.C. and P.C.] just need general visitation with their dad, certainly a coresidential schedule between both of their parents." 2 VRP (July 27, 2021) at 177.

William testified that he had never touched his daughters in any sexual manner. He stated that after the October 2018 parenting plan, he had consistent visits with his daughters that went well. Also in 2018, after entry of the parenting plan, he called Kimberley and she told him that she had started a new relationship and "she had discussed it with [William's] children, and they were all in agreement that's [sic] it's best that if [William] let him adopt [his] children and they

9

can go off and live their happy lives, and [William] can go off and live somewhere else." 3 VRP (July 28, 2021) at 246. William rejected the idea.

William also testified that a number of accusations were made against him since 2018. He had been pulled over three times because of reports made to police. Once, he was pulled over and searched because the police had been informed that he was driving and waving a pistol out his window. He did not have a firearm. Police also stopped him because his car was reported stolen. In February or March 2020, William received a call from a detective in Fayetteville, North Carolina where a report was made that William had raped his daughter and was attempting to murder Kimberley. William had never been to North Carolina. Another time, Kimberley drove K.S. to speak with law enforcement in Lewis County. Subsequently, William received calls from law enforcement in Lewis County and Mason County regarding the same alleged incident in which he had supposedly held K.S. under water and then raped her. William was also interviewed by law enforcement in Tacoma, as well as Orting. He has never been charged with a crime. He was also contacted by Tumwater CPS regarding a concern of whether he had running water or electricity. He has never been without these.

William testified that he did not believe that Kimberley had the best interests of E.C. and P.C. at heart. He stated:

> [T]hese allegations—I'm sorry. These allegations will not stop. They started off with nothing happening to trickling now to full-blown rape to keep me from the counseling so that I could not be part of the counseling.
> I feel that it was all part of a way to alienate me and to keep the stories going to further distance me and my relationship with my daughters.

3 VRP (July 28, 2021) at 264.

William's counsel asked William questions about two founded findings made by CPS against William, including the one made before entry of the 2018 parenting plan.

> [COUNSEL:] There has been one finding already previous to this court proceeding by the Department of Social and Health Services; is that correct?
> [WILLIAM:] Yes.
> [COUNSEL:] And you appealed that decision; is that correct?
> [WILLIAM:] That is correct.
> [COUNSEL:] And after the decision of Judge Kirkendoll they removed and altered the findings to no findings; is that correct?
> [WILLIAM:] Yes, that's correct.
> [COUNSEL:] Now there has been a subsequent finding by the Department; is that correct?
> [WILLIAM:] Yes.
> [COUNSEL:] And you have appealed that?
> [WILLIAM:] Yes, I have.
> [COUNSEL:] That is Exhibit No. 8 which is setting your prehearing conversation for August 12th?
> [WILLIAM:] Yes.

3 VRP (July 28, 2021) at 265. William's counsel later referenced the findings again.

> [COUNSEL:] After the entry of that parenting plan of October 12th, 2018, was that first finding set aside?
> [WILLIAM:] Yes.
> [COUNSEL:] Now you have a second accusation which is founded, correct?
> [WILLIAM:] Yes.[4]

3 VRP (July 28, 2021) at 267.

During trial, William asked the trial court to find that Kimberley had engaged in the abusive use of conflict. William argued that the obtaining of a protection order could "be just as abusive as the filing of bad faith motions, petitions, modifications." 3 VRP (July 28, 2021) at 313. William also emphasized the repeated reports to law enforcement agencies.

---

[4] CPS made this finding in 2020, and the appeal of this finding was pending at the time of trial in this matter.

11

E.     FINAL ORDER AND FINDINGS

The trial court gave its oral ruling on August 6, 2021. On September 3, 2021, the court

signed its final orders. The trial court approved a minor modification to the 2018 parenting plan,

stating:

> The court approves a minor change to the parenting/custody order. The court
> signed the new *Parenting Plan* or *Residential Schedule* filed separately today or on
> *September 3, 2021*. The minor change is approved because:
>
> - The requested change is in the children's best interest and does not change the
>   person the children live with most of the time; and
> - There has been a substantial change in the children's or a parent's situation.
>
> **Everything in the last several years has been destructive to the children's
> development.**

CP at 173. The trial court denied the request for a major modification because the change was not

in the children's best interest. The court then entered the following findings:

1)     The Guardian ad Litem testified that the children believed that they were
       abused sexually by their father. That may be their belief, but the Court is
       not convinced on a more probable than not basis that actual sexual abuse
       occurred.

2)     The Guardian ad Litem described [E.C.'s] first two conversations with Ms.
       Cull regarding her father as "wanting more time but that her mother did not
       want her to have more time." The third conversation a week later, [E.C.]
       had negative things to say about her father and did not want to see him. The
       Court finds in probability that theses [sic] statements by [E.C.] are being
       driven by someone, either [Kimberley] or [K.S.] who constructed this third
       statement to the Guardian ad Litem and its contents. This determination
       and/or finding is based upon the language used by the minor child and the
       overall timing of what was said by the child and all three of those
       interactions.

3)     The Court is concerned that [Kimberley] has manipulative tendencies.

4)     [P.C.] has been greatly adversely affected by the conflict and stress that has
       been going on for years with her parents.

5)      Witness Jain Toal, Family Therapist, never talked to the Guardian ad Litem, was totally unprepared to testify, could not remember the children's names without prompting, did not have her notes, made marginal efforts to contact [William], and her efforts were grossly insufficient.  Ms. Toal's testimony was infused with bias.  Ms. Toal's testimony was shallow, biased, and generally not credible.

6)      The testimony of Shandace Schaefer who provided therapeutic intervention to [K.S.] did not evaluate whether the child's disclosures were coached, nor did she arrange for a formal forensic interview.  Her focus was solely on listening and validating the child's concerns.  She made no collateral contacts.

7)      Since the entry of the Parenting Plan on October 10, 2018, there have been approximately 10 reports to Child Protective Services that [Kimberley] either initiated or participated in supporting against [William].  All but one were ultimately determined to be "unfounded".  The one founded is still being adjudicated by [William].

8)      [K.S.'s] story morphed.  [Kimberley] initially did not believe the story.  The Court is not convinced either.

9)      Legal proceedings have been initiated by [Kimberley] in multiple counties, one of which resulted in the entry of a No Contact Order from Thurston County Superior Court.  This Order prohibited [William] from contacting [Kimberley] or the children.  The Court finds on a more probable than not basis that [Kimberley] engaged in abusive use of conflict.

10)     [P.C.'s] hair pulling, and the children's other episodes of self-harm are likely the result of the enormous stress of the parental relationship and conflict and ongoing legal proceedings interjected into their lives.

11)     Roxanne Cull who has dealt with all members of the family, albeit some less than others, was unpersuaded of [K.S.'s] memory of sexual abuse at the hands of her father as there were no facts that supported those memories.  The Court agrees with this counselor's view.  Ms. Cull was fully prepared for her testimony, and it was credible.  Ms. Cull observed the minor children with their father when the children and [William] did not know the observation was occurring.  The observed interaction was positive.

> These children have been adversely affected by passing through a multitude of counselors sometimes having inconsistent messages and are being required to be exposed to repetition of traumatic events.

> 12) There was no substantial evidence that [William] had any sort of sexually [sic] deviancy or that he engaged in any kind of sexual contact with the children. [William's] testimony was credible, and the lack of charges, Michael Compte's evaluation, and the reversal of founded CPS findings supports his testimony.

CP at 174-75.

> The trial court entered the following order:

> The Court makes this specific finding that neither party will be determined to be the primary custodian of the minor children for purposes of application of the relocation statute preference found in RCW 26.09.520. The basis for this departure from the statutory language is the court's belief that the proposed relocation is not in good faith.

> Any further unfounded allegations filed with Child Protective Services by or at the instigation of [Kimberley] will be grounds for suspension of her rights under this Order when those allegations are brought to the Court's attention by a motion.

> In the event that there is a founded finding from Child Protective Services about [William], that will also be grounds for suspension of his rights under this Order when it is brought to the Court's attention by motion.

> A reunification counselor for [E.C.] and [P.C.] will be with a counselor identified by Ms. Cull. The children should continue with Maechelle Ritter.

CP at 176 (underlining omitted). Although neither party would be designated the primary custodian for purposes of relocation, the trial court stated that Kimberley would be the primary custodian "for the purpose of all state and federal statutes which require a designation or determination of custody." CP at 179. The trial court also stated that the person with the children the majority of the time must provide notice of relocation to any other person with residential time.

14

In the final parenting plan, the trial court outlined a plan that extended William's time on the weekends with the E.C. and P.C. and also gave him a mid-week dinner with the girls.

> [William] will have a supervised visit on August 14, 2021 with [E.C.] and [P.C.]. He will also have a mid-week visit for dinner commencing on August 18, 2021. That visit will also be supervised. Thereafter [William] will have another 4 hour visit the following Sunday. The next Saturday visit will be 8 hours and then the following Sunday will be 8 hours the next weekend. That will occur on September 4th and September 12th, 25th, and October 3, 2021.
>
> Beginning Friday October 15, 2021 at 6:00pm [William] will have an overnight visit until the 16th at 6:00pm, and then in the alternating weekends that follow from Friday at 6pm until Saturday at 6pm. Then starting December 3, 2021 the schedule will change to [William] having the children from Fridays at 6:00pm through Sunday at 6:00pm every other weekend. The mid-week dinner on Wednesdays between 5:00pm to 8:00pm will continue in the week following [William's] weekend visit, or is otherwise every other week.
>
> Starting January 1, 2022, the parties will divide the holidays and school for vacations and breaks from school equally. Each party will have two uninterrupted weeks of parenting time in the summer beginning in 2022.
>
> Commencing January 1, 2022 father will have alternating weekends from Friday at 6:00 pm through Sunday at 6:00 pm. In the weekends during the mid-week that he does not have the upcoming weekend visitation father will have Wednesdays from 5 pm through 8pm.

CP at 179-80.

The trial court ordered William to file proof that he completed the domestic violence treatment and clinical intake required by the Thurston County protection order. The trial court also ordered Kimberley and William to take part in a co-parenting program, "communicate about the children by electronic means, for example through Talking Parents," and also ordered that when they exchanged the children, they "maintain a 100 foot separation." CP at 186 (underlining omitted). In order to effectuate these terms, the trial court stated that the Thurston County Order for Protection was overruled to the extent it contradicted the parenting plan.

15

On September 13, 2021, Kimberley moved for reconsideration. The trial court denied her motion.

Kimberley appeals.

ANALYSIS

A.    LEGAL PRINCIPLES

A trial court has broad discretion when ordering a permanent parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), *cert. denied*, 568 U.S. 1090 (2013). In exercising this discretion, a trial court is best situated to assign weight to the various factors at issue in a specific case. *In re Marriage of Chandola*, 180 Wn.2d 632, 658, 327 P.3d 644 (2014). "But while trial courts have broad discretion in the context of a parenting plan, that discretion must be exercised within the bounds of the applicable statutes." *Id.*

A trial court abuses its discretion when its "decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.

*Id.* at 47.

The trial court's findings of facts are verities on appeal when unchallenged. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). Appellate courts do not review credibility determinations made by the trier of fact. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). And an appellate court is "reluctant to disturb a child custody

16

disposition because of the trial court's unique opportunity to personally observe the parties." *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981).

B.      REMOVAL OF STATUTORY PRESUMPTION IN FAVOR OF RELOCATION

Kimberley argues that the trial court erred by ruling that neither parent would have the statutory presumption in favor of relocation. Because the trial court exceeded its statutory authority when it removed the statutory presumption, we agree.

RCW 26.09.430 requires that "a person with whom the child resides a majority of the time" must provide notice to "every other person entitled to residential time or visitation" should they intend to relocate. But Kimberley did not provide William with the statutorily required notice. And the trial court expressly stated that it was not considering Kimberley's motion for relocation because she had failed to provide William the required statutory notice. Therefore, because the trial court did not have a proper motion for relocation before it, the trial court did not have the authority to make any rulings relating to relocation. Accordingly, we reverse the trial court's ruling that neither parent would have the statutory presumption in favor of relocation and remand for the trial court to strike the following in paragraph 12 of its final order filed on September 3, 2021:

> The Court makes this specific finding that neither party will be determined to be the primary custodian of the minor children for purposes of application of the relocation statute preference found in RCW 26.09.520. The basis for this departure from the statutory language is the court's belief that the proposed relocation is not in good faith.

CP at 176 (underlining omitted).

C.      UNFOUNDED CPS REPORTS

Next, Kimberley argues that the trial court abused its discretion by ordering that further unfounded allegations to CPS filed by Kimberley or instigated by her would be grounds for the suspension of her rights under its final order. She contends that the order undermines the legislative purpose of the Child Abuse and Neglect Act (CANA), chapter 26.44 RCW, because it prohibits CPS reporting and violates her right to free speech and to petition the government for a redress of grievances under the First Amendment to the United States Constitution. We agree.

1.      The Child Abuse and Neglect Act

In the CANA, the legislature has provided for the reporting of "instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents, custodians or guardians," as well as "instance[s] where a child is deprived of his or her right to conditions of minimal nurture, health, and safety." RCW 26.44.010. Under the CANA , "health care providers and other mandatory reporters must inform a law enforcement agency or DSHS when he or she 'has reasonable cause to believe that a child has suffered abuse or neglect.'" *Brown v. Dep't of Soc. and Health Servs.*, 190 Wn. App. 572, 585, 360 P.3d 875 (2015) (quoting RCW 26.44.030(1)(b)). The CANA also provides that "[t]he reporting requirement shall also apply to any adult who has reasonable cause to believe that a child who resides with them, has suffered severe abuse, and is able or capable of making a report." RCW 26.44.030(1)(d).[5]

---

[5] "Severe abuse" means

[a]ny single act of abuse that causes physical trauma of sufficient severity that, if left untreated, could cause death; any single act of sexual abuse that causes significant bleeding, deep bruising, or significant external or internal swelling; or

Here, the trial court ordered:

> Any further unfounded allegations filed with Child Protective Services by or at the instigation of [Kimberley] will be grounds for suspension of her rights under this Order when those allegations are brought to the Court's attention by a motion.

CP at 176 (underlining omitted).

The trial court's order conflicts with the CANA because it states that *any* reports filed with CPS would be grounds for suspension of Kimberley's rights if CPS determines that the allegations were unfounded. The order potentially prohibits proper reporting under the CANA and will cause Kimberley, and other potential reporters, to hesitate before reporting incidents for fear that CPS will determine that the reports are unfounded. Because the court order potentially prohibits legitimate reports, we vacate the order and remand for modification of the order. On remand, the trial court may consider an order with more specific language that is not in violation of the CANA or Kimberley's First Amendment rights as addressed in the next section.[6]

---

more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness.

RCW 26.44.030(1)(d).

[6] Kimberley also argues that the court order violates her right to confidentiality under RCW 26.44.030(11), which provides that "[t]he department shall provide assurances of appropriate confidentiality of the identification of persons reporting under this section" for the proposition that the legislature intended for the identities of reporters of abuse and neglect to remain confidential. Based on this statute, she argues that "the Legislature intended for the identities of the reporters of abuse and neglect to remain confidential." Br. of Appellant at 41. Kimberley provides no analysis on the meaning of "appropriate confidentiality." Additionally, the trial court made no ruling as to RCW 26.44.030(11); rather, it appears from the language of the order that the determination of whether an allegation was made by Kimberley or at her instigation would be determined by the trial court on the facts before it once a motion is made.

2. First Amendment Rights

The First Amendment to the United States Constitution prohibits government interference with a person's "freedom of speech" or a person's "right . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I; *In re Marriage of Meredith*, 148 Wn. App. 887, 896, 201 P.3d 1056, *review denied*, 167 Wn.2d 1002, 220 P.3d 207 (2009). "Although the right to free speech and the right to petition are separate guaranties, they are related and generally subject to the same constitutional analysis." *Meredith*, 148 Wn. App. at 896. Neither the right to free speech nor the right to petition the government protects harassing or libelous speech. *Id.* at 899.

a. Prior restraint on free speech

The United States Supreme Court defines prior restraints to include

> "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—i.e., *court orders that actually forbid "speech activities*—are *classic examples of prior restraints*."

*Id.* at 896 (second and third emphasis added) (internal quotation marks omitted) (quoting *In re Marriage of Suggs*, 152 Wn.2d 74, 81, 93 P.3d 161 (2004)). There is a heavy presumption that prior restraints are unconstitutional. *Id.* at 897. Therefore, prior restraints are allowed "in only 'exceptional cases such as war, obscenity, and incitements to acts of violence and the overthrow by force of orderly government.'" *Id.* (internal quotation marks omitted) (quoting *Suggs*, 152 Wn.2d at 81)).

In *Meredith*, a husband, Anthony P. Meredith, argued that the trial court violated his First Amendment rights when it prohibited him from "contacting *any* agency" regarding his wife's, Jazmin Muriel's, immigration status. *Id.* at 895 (emphasis in original). The court ordered that

"'[a]ny contact that Mr. Meredith believes to be necessary must first be approved by this court through the undersigned judge/department.'" *Id.* at 896. On appeal, the court concluded that "Meredith had the right, as does everyone in this country, to make a valid report to government authorities regarding Muriel's presence in the country" and "the order is clearly a prior restraint that forbids Meredith from speaking in the future." *Id.* at 897. Because the order prohibited not only unprotected speech but also speech protected under the First Amendment, the court concluded that it was an unconstitutional prior restraint. *Id.* at 898.

The *Meredith* court relied on *Suggs*. In *Suggs*, the trial court found that Shawn Suggs harassed her former husband and the court permanently restrained her from "'knowingly and willfully making invalid and unsubstantiated allegations or complaints to third parties which are designed for the purpose of annoying, harassing, vexing, or otherwise harming Andrew O. Hamilton and for no lawful purpose.'" 152 Wn.2d at 76-77. The Supreme Court determined that the order was a prior restraint "because it forbids Suggs' speech before it occurs." *Id.* at 81. The Supreme Court also stated that the order chilled Suggs' speech because it did not specifically state what she could say and language that she thought was valid could "ultimately be found invalid and unsubstantiated." *Id.* at 84.

Here, the trial court ordered:

Any further unfounded allegations filed with Child Protective Services by or at the instigation of [Kimberley] will be grounds for suspension of her rights under this Order when those allegations are brought to the Court's attention by a motion.

CP at 186. As in *Meredith* and *Suggs*, the trial court's order does not prohibit only unprotected speech; rather, the order prohibits all reports to CPS that are ultimately determined to be unfounded. Although the order does not specifically prohibit particular language, it could

encompass speech by Kimberley and other potential reporters that they believe valid and substantiated even if CPS ultimately determines that they are not. The result of the order also may chill Kimberley's, as well as other potential reporters', ability to make any report at all based on fear that the allegations would ultimately be determined to be unfounded. *See Meredith*, 148 Wn. App. at 898; *Suggs*, 152 Wn.2d at 84. Thus, the trial court's order is a prior restraint on speech.

   b.      Prior restraint on the right to petition the government

The First Amendment right to petition the government for a redress of grievances "'extends to all departments of the [g]overnment.'" *Meredith*, 148 Wn. App. at 899 (alteration in the original) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972)). This right extends to "petition 'any department of the government, including state administrative agencies.'" *Id.* (quoting *Ctr. for United Lab. Action v. Consol. Edison Co.*, 376 F. Supp. 699, 701 (S.D.N.Y. 1974)).

In *Meredith*, the court stated that "a citizen does not lose the right to petition the government merely because his communication to the government contains some harassing or libelous statements." *Id.* at 900. The court noted that although Meredith could contact a government agency in order to harass or commit libel, a court "may not institute a sweeping prior restraint of government petitions based on . . . past bad deeds." *Id.* at 902. The court ordered that the challenged order must be vacated as, again, it prohibited both protected and unprotected speech and petitions. *Id.* at 902.

Because a report that is ultimately determined to be "unfounded" may encompass both valid complaints as well as unprotected speech and petitions, we vacate the trial court's order that

further unfounded allegations to CPS filed by Kimberley or instigated by her would be grounds for the suspension of her rights under its final order.

D.      OMISSION OF 2018 PARENTING PLAN FINDING

Kimberley argues that the trial court erred by not incorporating the 2018 parenting plan's finding that stated CPS had upheld a finding of physical and sexual abuse. She contends that the 2018 parenting plan was the law of the case as both parties agreed to the parenting plan and it was never appealed. She also contends that the trial court erred because it failed to follow required criteria for modification in RCW 26.09.260, which requires a substantial change of circumstances before a parenting plan may be changed.

RCW 26.09.260 outlines the criteria and procedures for modification of a parenting plan. *In re Marriage of Watson*, 132 Wn. App. 222, 230, 130 P.3d 915 (2006). A trial court "abuses its discretion if it fails to follow the statutory procedures or modifies a parenting plan for reasons other than the statutory criteria." *Id.*

In order to grant a modification, RCW 26.09.260 requires

> upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

RCW 26.09.260(1). In addition, RCW 26.09.260(5) provides that the change can be in the circumstances "of either parent or of the child."[7]

---

[7] Kimberley appears to mistakenly cite RCW 26.09.260(4) when referencing a minor modification, but the statute is RCW 26.09.260(5).

The finding at issue is found in section 3.b. "Other problems" and section 4 "Limitations on a parent" of the 2018 parenting plan. CP at 2 (boldface omitted). Section 3.b. provides that a "court *may* limit" a parent's contact if they have other problems that may affect the children's best interests. CP at 2. In the 2018 parenting plan, the superior court declined to apply limitations and explained its reasoning in section 4 "Limitations on a parent." CP at 2 (boldface omitted). The trial court wrote:

> After an investigation, allegations that the father sexually and physically abused one daughter and sexually abused another daughter were deemed founded by CPS. Those findings were subsequently upheld upon further review by CPS. The father denied all allegations. After months of professionally-supervised and lay-supervised visitation, the parties, with the help of counseling and in the interest of moving forward in the best interests of the children, have agreed to a parenting plan that slowly provides for increasing residential time for the father.

CP at 2.

Kimberley argues that the above finding should have been included in the 2021 parenting plan because the record did not show any substantial change in circumstances that would permit reconsideration of the finding. She argues that the only "substantial change at issue in this modification centered around additional disclosures of sexual abuse made by one or more of the children *after* the Parenting Plan was entered and resulting CPS reports." Br. of Appellant at 51.

The trial court, however, entered the following finding of fact:

> 12)    There was no substantial evidence that [William] had any sort of sexually [sic] deviancy or that he engaged in any kind of sexual contact with the children. [William's] testimony was credible, and the lack of charges, Michael Compte's evaluation, and *the reversal of founded CPS findings supports his testimony*.

CP at 175 (emphasis added).

Here, the trial court's finding of fact 12 references a reversed CPS finding. The record reflects that the trial court had before it evidence that CPS's 2017 finding of sexual abuse upheld before entry of the 2018 parenting plan, and referenced in that plan, was subsequently overturned by a court. In 2019, because of the reversal, the 2017 CPS finding was altered to unfounded.[8]

Because the 2017 CPS finding referenced in the 2018 parenting plan was subsequently overturned by a court, the decision to not include the 2017 CPS finding in the 2021 parenting plan was not based on "litigation of *subsequent* reports of sexual abuse" as Kimberley argues. Br. of Appellant at 52. The trial court explicitly considered the reversal of CPS's 2017 founded finding. Because there was no basis to include the overturned 2017 CPS finding referenced in the 2018 parenting plan in the new parenting plan, we reject Kimberley's argument.

E.      MINOR MODIFICATION

Kimberley argues that the trial court erred when it denied the major modification she proposed and granted a minor modification in favor of William. She contends that a trial court may not make changes in favor of the nonmoving party when that party had failed to show adequate cause; instead, the trial court should have denied her petition and reinstated the 2018 parenting plan. We disagree.

Pursuant to RCW 26.09.260(5), a trial court may make minor modifications to a parenting plan when a substantial change in circumstances of either parent or the child has been shown:

> The court may order adjustments to the residential aspects of a parenting plan upon a showing of a substantial change in circumstances of either parent or of the child . . . if the proposed modification is only a minor modification in the residential

---

[8] At the time of trial below, William was appealing the only other founded finding, which was made after entry of the 2018 parenting plan.

schedule that does not change the residence the child is scheduled to reside in the majority of the time.

The legislature has provided great discretion to trial courts in determining residential schedules:

When judicial officers have the discretion to tailor individualized resolutions, the legislative intent expressed in RCW 26.09.002 can more readily be achieved. Judicial officers should have the discretion and flexibility to assess each case based on the merits of the individual cases before them.

RCW 26.09.003. In its decisions, the trial court's focus must be the best interests of the child:

In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. . . . [T]he best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

RCW 26.09.002.

Kimberley argues that the trial court could not deny her request for a major modification and then modify the parenting plan in favor of William on other grounds. She relies on *Watson* and *In re Marriage of Shryock*, 76 Wn. App. 848, 888 P.2d 750 (1995). These cases, however, are distinguishable. *See Marriage of Watson*, 132 Wn. App. at 233 (reversal of trial court decision to deny mother's modification petition but implement restrictions on the father on a basis that neither party had contemplated and was not supported by the record); *Marriage of Shryock*, 76 Wn. App. at 852 (trial court lacked authority to adopt mother's proposed parenting plan which gave her sole decision-making authority when it denied father's modification petition because none of the statutory reasons outlined in RCW 26.09.260 applied).

Unlike in both *Watson* and *Shryock*, where the trial courts modified the parenting plans without any basis to do so or on grounds not contemplated by the parties, both Kimberley and

William specifically asked the trial court to make a determination with regard to abusive use of conflict. In her proposed parenting plan, Kimberley claimed that William had used abusive use of conflict and asked the court to restrict his time with the girls. At trial, William asked the court to make a finding that Kimberley had engaged in abusive use of conflict. In doing so, William cited the continued interviews with law enforcement, therapists, and CPS. The trial court specifically found that Kimberley had used abusive use of conflict and that the past three years had damaged the children's development. The trial court's findings reflect that it placed credibility in William's testimony and that it determined that Kimberley had used abusive use of conflict to keep the children from William. The trial court was concerned that Kimberley had manipulative tendencies and that either Kimberley or K.S. had influenced E.C. to say that she did not want to see her father. The trial court observed that Kimberley had not initially believed K.S.'s story of sexual abuse. Despite that, Kimberley initiated legal proceedings in multiple counties, including obtaining an order for protection, which prevented William from seeing the children.

Here, the trial court found that Kimberley had engaged in abusive use of conflict. The trial court also stated that everything that had occurred in the past three years was destructive to the girls' development. Kimberley does not challenge these findings on appeal, and thus, they are verities. *Cowiche Canyon Conservancy*, 118 Wn.2d at 808.

Because the parties raised the issue of abusive use of conflict,[9] and the trial court specifically found that Kimberley had recently engaged in abusive use of conflict, which precluded the children and William from having any residential time, there was "a substantial change in

---

[9] The trial court did not enter any limitations under RCW 26.09.191(3)(e) based on its finding that Kimberley had engaged in abusive use of conflict.

circumstances of either parent or of the [children]." RCW 26.09.260(5). Thus, the trial court was permitted to make a minor modification to the parenting plan to allow the children to again be able to see their father on an incremental basis. The trial court did not abuse its discretion by making a minor modification to the parenting plan.

## F.    MODIFICATION OF DOMESTIC VIOLENCE PROTECTION ORDER

Kimberley argues that the trial court abused its discretion by requiring Kimberley and William to engage in joint decision-making, requiring them to communicate regarding the children through electronic means, and requiring them to mediate future disagreements, which would violate provisions of the Thurston County DVPO. She contends that a trial court is not permitted to consolidate a case from another county with the case before it and a trial court must follow specific procedures before modification of a DVPO.[10]  We disagree.

RCW 7.105.550[11] specifically contemplates consolidation of a previously issued protection order by a trial court:

---

[10]  Kimberley also argues that "a superior court in one county cannot consolidate a case in another county into one pending before it." Br. of Appellant at 57. Her cited authority, however, does not apply to parenting plans or protections orders. *Am. Mobile Homes of Wash., Inc. v. Seattle-First Nat'l Bank*, 115 Wn.2d 307, 319, 796 P.2d 1276 (1990).

[11]  Kimberley cites Former RCW 26.50.025(1) (2019), *repealed by* LAWS OF 2021, ch. 215, § 170. But chapter 7.105 RCW governs the modification or termination of protection orders entered before July 1, 2022. RCW 7.105.550(2) provides:

> Nothing in chapter 215, Laws of 2021 affects the validity of protection orders issued prior to July 1, 2022, under . . . former chapter[] . . . 26.50 RCW. Protection orders entered prior to July 1, 2022, under . . . former chapter[] . . . 26.50 RCW are subject to the provisions of chapter 215, Laws of 2021 and are fully enforceable under the applicable provisions of RCW 7.105.450 through 7.105.470 and may be modified or terminated in accordance with the applicable provisions of RCW 7.105.500 through 7.105.550.

> *If a party files an action under chapter 13.32A, 26.09, 26.26A, or 26.26B RCW, an order issued previously under this chapter between the same parties may be consolidated by the court under that action and cause number.* Any order issued under this chapter after consolidation must contain the original cause number and the cause number of the action under chapter 13.32A, 26.09, 26.26A, or 26.26B RCW.

RCW 7.105.550(1)(b) (emphasis added); s*ee also Maldonado v. Maldonado*, 197 Wn. App. 779, 796, 391 P.3d 546 (2017) (noting that under Former RCW 26.50.025, if a party to a protection order proceeding in King County "petition[ed] in Snohomish County to modify the parenting plan, the court there may consolidate the protection order with the modification proceeding and make changes to the order as the court sees fit.")

Kimberley cites the procedures and criteria for modification of a protection order under former chapter 26.50 RCW to argue that the trial court lacked authority to overrule or modify the final rulings made by the Thurston County Superior Court when it entered its parenting plan. However, Kimberley cites to no authority to support her argument that, when entering a parenting plan, a trial court must defer to a previously entered protection order.

Chapter 26.09 RCW, which governs dissolution proceedings, including the modification of parenting plans, leaves to the trial court the determination of whether a party has engaged in "a history of acts of domestic violence":

> The permanent parenting plan shall not require mutual decision-making or designation of a dispute resolution process other than court action *if it is found* that a parent has engaged in any of the following conduct: . . . a history of acts of domestic violence as defined in RCW 7.105.010.

RCW 26.09.191(1) (emphasis added). Further, RCW 26.09.191(2)(n) provides in part:

> The weight given to the existence of a protection order issued under chapter 7.105 RCW or former chapter 26.50 RCW as to domestic violence is within the discretion of the court.

29

Here, the trial court ordered the following orders:

[William] must file proof of completing the domestic violence treatment and clinical intake as ordered through case number 20-2-30102-34.

. . . .

The parties shall engage in a program that discusses co-parenting.

. . . .

[William and Kimberley] shall communicate about the children by electronic means, for example through Talking Parents. The parties will maintain a 100 foot separation when exchanging the children. This does not apply to 3rd parties.

CP at 185-86. And the trial court stated that the Thurston County Order for Protection was overruled to the extent it contradicted the parenting plan.

The trial court made no finding that William had engaged in acts of domestic violence. Because the trial court made no finding of a history of domestic violence and the court had discretion to weigh the protection order before it, the court was not required to enter a permanent parenting plan that would mirror the previously entered protection order.

G.    JUDICIAL BIAS

Kimberley contends that should this court remand this case to the trial court for entry of any discretionary decision, it should order that the case be reassigned to a different judge because of judicial bias. We decline this request.

"A judicial proceeding satisfies the appearance of fairness doctrine only if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing." *Tatham v. Rogers*, 170 Wn. App. 76, 96, 283 P.3d 583 (2012). "A trial court is presumed to perform its functions regularly and properly without bias or prejudice." *Meredith*,

148 Wn. App. at 903. "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that 'a reasonable person knows and understands all the relevant facts.'" *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995) (quoting *SEC v. Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988), *cert. denied*, 490 U.S. 1102 (1989)). "[E]vidence of a judge's actual bias is not required; it is enough to present evidence of a judge's actual or potential bias." *Tatham*, 170 Wn. App. at 95. Mere speculation is insufficient to show bias. *Id.* at 96.

In *In re Marriage of Black*, the Supreme Court stated that "[r]eassignment may be sought where 'the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue.'" 188 Wn.2d 114, 137, 392 P.3d 1041 (2017) (quoting *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014)). In *Marriage of Black*, the Supreme Court reversed the trial court's parenting plan, which awarded the father sole decision-making authority regarding education for the children and denied the mother's request for spousal support. 188 Wn.2d at 135-37. The Supreme Court held that the record showed that the trial court had improperly considered the mother's sexual orientation when fashioning the plan and favored the father's religious beliefs. *Id.* at 117. The GAL's report on which the trial court relied demonstrated impermissible bias against the mother because of her sexual orientation as well. *Id.* at 127.

Kimberley contends that reassignment is required because of the trial court's rulings made on the issues discussed in this prehearing. She asserts that because the trial court will exercise discretion once again on the issues that she raises on appeal, the case should be assigned to another judge as the trial court has already "'expressed an opinion as to the merits, or otherwise prejudged

the issue.'" Br. of Appellant at 66. Apart from the trial court's rulings below, Kimberley cites to no evidence of bias.

The mere fact that a trial court issued a decision in a case that is not in favor of the appellant is insufficient to show that a court is biased. Because Kimberley cites no evidence of actual or potential bias, we decline to remand to a different judge.

CONCLUSION

The trial court erred by ruling that neither parent would have the statutory presumption in favor of relocation and by ruling that future unfounded reports by Kimberley or at her instigation to CPS would lead to the termination of her rights under its final order. Therefore, we reverse those orders, and we remand to the trial court to strike its order relating to the statutory presumption in favor of relocation. We affirm the remainder of the trial court's orders.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, C.J.

Veljacic, J.