# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of<br><br>DONALD A. MARSCH,<br><br>                       Respondent,<br><br>   and<br><br>DEBRA L. CLEERE,<br><br>                       Appellant. | No. 58052-7-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, J.—Donald Marsch and Debra Cleere began living together in 1993 and married in 2009. In 2021, they entered a separation agreement that divided their property. When the trial court approved Marsch and Cleere's joint petition for dissolution later that year, it ordered the parties to comply with the terms of the agreement.

A little less than a year later, Cleere filed a CR 60(b) motion to vacate the dissolution decree, arguing that Marsch failed to fully disclose his assets. The trial court denied her motion.

On appeal, Cleere argues that the trial court abused its discretion in declining to vacate the dissolution decree. Specifically, she challenges three findings of fact and she argues that the trial court should have granted her motion under CR 60(b)(1), due to her mistake and excusable neglect, and under CR 60(b)(4), due to Marsch's misrepresentation and misconduct. Marsch requests attorney fees on appeal, arguing he is entitled to fees under the separation agreement. Cleere also

requests attorney fees on appeal under RCW 26.09.140 based on the parties' relative need and ability to pay.

We affirm. We conclude that Marsch is entitled to his attorney fees on appeal under the separation agreement. Cleere has not filed the affidavit required under RAP 18.1(c), so we deny her request for fees.

FACTS

I. BACKGROUND AND SEPARATION AGREEMENT

Marsch and Cleere began living together in 1993 and they married in 2009. They separated in 2020. In the years before the separation, Cleere had several injuries and health problems that required surgeries and lengthy recoveries, and she became disabled. Toward the end of the marriage, Cleere gambled frequently and relied on Marsch to pay the resulting debts. In March 2021, she was diagnosed with gambling disorder and adjustment disorder. That year, she reported nearly emptying her retirement account and accumulating $60,000 in credit card debt because of her gambling.

In July 2021, Marsch and Cleere entered into a separation agreement. The agreement provided that each party had made "a full and complete financial disclosure . . . of all their respective assets, both joint and separate." Clerk's Papers (CP) at 5. The agreement's list of financial accounts stated that the balances were current as of late June 2021.

According to the provisions addressing property division,[1] Cleere and Marsch divided $581,000 from an Alliant account equally. Marsch also divided his share of his family's trust

---

[1] All dollar amounts in the paragraphs describing the property division are approximate.

equally with Cleere, with deposit accounts and two properties in the trust yielding $205,000 for each of them.

Marsch alone received a condominium, a 2020 Honda, and a United Airlines retirement account worth $1.89 million. Marsch also retained responsibility for all payments associated with the Honda.

Cleere agreed to sell a separate condominium the couple owned in the same building. She received all of the net proceeds from the sale, approximately $500,000. Cleere also received a 2011 Chrysler, agreeing to take responsibility for any payments associated with it, and additional accounts worth approximately $234,500: a Schwab brokerage account worth $70,500 and a Schwab rollover retirement account worth $164,000. Cleere retained her only retirement account, which was worth $1,500. It appears that Cleere almost emptied this retirement account when she was gambling.

In sum, Cleere ended up with a total of more than $700,000 in investments and other accounts, in addition to the $500,000 in sale proceeds from one condominium. She took on any debt associated with the 2011 Chrysler. Marsch ended up with approximately $2.38 million in accounts and investments, as well as the other condominium. Marsch also ended up with any debt associated with the 2020 Honda.

In the separation agreement, the parties waived their community property rights, equitable distribution rights, and any other rights "arising out of or in any way connected to the marriage," acknowledging that the agreement "equitably distributed all such marital assets appropriately." CP at 9. The parties also expressly waived any rights to spousal support.

The agreement provided that both parties "freely and fully" accepted its "provisions, terms[,] and conditions," and that by executing the agreement, each party acknowledged that it was fair and "not the result of any fraud, duress, or undue influence." CP at 5, 9. The agreement provided that each party "had the opportunity to have independent counsel and legal advice of [their] own selection" in negotiating the agreement. CP at 9. And it provided that if either party hired an attorney to collect, enforce, or protect their interest with respect to the agreement, the prevailing party would "be entitled to receive payment of all costs and expenses of such collection, enforcement[,] or protection, including reasonable attorneys' fees." *Id.*

## II. DISSOLUTION

Marsch and Cleere jointly petitioned for dissolution in July 2021, near the same time they executed the separation agreement. The petition asked the trial court to enforce the separation agreement and stated that spousal support was not needed.

At a hearing in October of that year, Marsch's attorney presented the trial court with an agreed final order incorporating the separation agreement. Marsch was not present. Cleere appeared via Zoom without an attorney. After swearing her in, the trial court asked Cleere if she believed the separation agreement was fair. Cleere said, "I signed the agreement. I signed it of my own free will." CP at 214. The following exchange then took place:

> THE COURT: You signed the separation agreement of your own free will?
> MS. CLEERE: Yes. Yes, Your Honor.
> THE COURT: So you are agreeing, then, that the distribution is fair?
> MS. CLEERE: It's -- No. It's not fair. It's not fair, but this is what Mr. Marsch agreed to give me, so I agreed to it.
> THE COURT: Okay. So are you therefore saying that you're contesting this agreement, and you would like to have a trial set on this matter?
> MS. CLEERE: No. I just want -- no. I don't want a trial. . . . It's too emotional for me, so I'm agreeing with what he offered.

4

CP at 215-16. Cleere added that Marsch had "control of all the money" and while she did not want a trial, she wanted to make a record of the situation. CP at 216. The trial court asked Cleere if she wanted more time before finalizing the dissolution. Cleere declined the offer to take more time. The trial court then said, "So with you wanting to have the divorce finalized today, I have to ask that question again. Are you agreeing, then, that this division is acceptable to you?" *Id.* Cleere responded, "Yes, Your Honor." *Id.*

That day, the trial court approved the dissolution and entered findings and conclusions. The court ordered the parties to comply with the terms of the separation agreement, concluding that the division of property under the agreement was "just and equitable." CP at 20. Based on the agreement, the trial court did not order spousal support.

### III. MOTION TO VACATE THE DISSOLUTION DECREE

In October 2022, just under a year after the trial court entered its findings and conclusions, and the final dissolution decree, Cleere filed a CR 60(b) motion to vacate them. Cleere relied on multiple subsections of CR 60(b), including, among others, (1) mistakes and excusable neglect and (4) fraud, misrepresentation, or misconduct. Cleere argued that Marsch failed to fully disclose his assets and thus prevented her from pursuing "an appropriate resolution." CP at 57. Cleere also moved for the trial court to award spousal maintenance and attorney fees. Cleere and her brother, a financial analyst who helped her negotiate with Marsch, filed sworn declarations in support of the CR 60(b) motion.

A.      Cleere's and Her Brother's Declarations

Cleere declared that she entered a committed intimate relationship with Marsch in 1993, about 16 years before their marriage. She said that during the relationship, Marsch subjected her

to "mental abuse . . . on an almost daily basis." CP at 43. Cleere's brother said he witnessed Marsch make "horrific, degrading," and "emotionally abusive statements" to her. CP at 72.

Cleere also said Marsch exercised financial "coercive control": he "exclusively managed [the couple's] finances" and "kept [her] in the dark," and she lacked separate access to the couple's accounts, investments, and financial information. CP at 43, 54. Cleere explained that her numerous medical challenges, including "mental health and memory challenges," had forced her to rely on Marsch's representations about their financial situation. CP at 40. A letter from the United States Social Security Administration confirms that Cleere became disabled in 2008, the year before the couple married.

1. Separation agreement negotiation

According to Cleere, after she and Marsch separated, Marsch "set the terms for the divorce." CP at 46. Marsch gave Cleere a proposed separation agreement that his attorney drafted. He suggested that she seek an attorney's opinion, but because her income came entirely from Social Security disability insurance, she said this was impossible. Cleere's brother tried to arrange for an attorney to look at the separation agreement, but neither Cleere nor her brother could afford his services.

Cleere and her brother declared that Marsch made the negotiation process difficult, demanding that she sell the condominium she and Marsch had jointly owned and leave the state. Cleere said she lacked the psychological and emotional resources to disagree or make her own demands, and Marsch told her that if she challenged him, "a very expensive, [drawn-out] 'war' would ensue, and involvement of any lawyers would be very ugly for [her]." CP at 52. Cleere's brother declared that he heard Marsch make similar statements "on several occasions." CP at 73.

2. Allegations of asset concealment

Cleere's brother alleged that Marsch concealed various assets during the negotiation. At one point, Marsch had a retirement account with his former employer, Continental Airlines. After Continental Airlines merged with United Airlines, Marsch got a United Airlines retirement account. Cleere's brother said, "I do not know the outcome of the Continental Airlines retirement account as it relates to any merger with United Airlines. This remains a question." CP at 68. He said Marsch did not disclose "the process to divide . . . any Continental and/or any United retirements, or any merger of the accounts (if so), or any new accounts established with proceeds." CP at 69.

Cleere's brother said that after the dissolution, Cleere picked up boxes from Marsch while moving away and she found documents from 2018, 2019, and 2020, before the couple separated, showing undisclosed distributions from the United Airlines retirement account. Cleere's brother explained, "Where these funds went is . . . unknown[,] as all we can see is that the funds went into an Alliant account." CP at 70. Overall, in 2021—the year the parties entered the separation agreement—Marsch gave no information about "retirement contributions, the growth or loss associated with any retirement, any withdrawals or loans against [the retirement accounts], any investments within the retirements, or any details whatsoever for either retirement account." CP at 69.

Cleere and her brother also asserted that Marsch hid details about additional retirement accounts. Cleere's brother said that a 2017 tax return showed a rollover from an unidentified retirement account with a value of more than $2 million. But at the time of the separation, Marsch did not disclose the rollover or any details about it. Cleere's brother also said Marsch did not

7

disclose details about the Schwab rollover retirement account. And Cleere said she was not shown the balance of her own Continental Airlines retirement account.

Cleere and her brother also addressed other financial instruments. Cleere's brother seems to allege they were missing information about the Alliant account in 2021. Cleere said she never saw the balance of the Schwab brokerage account and that "there may be a Fidelity investment account somewhere[] that has not been fully disclosed." CP at 54. And Cleere said that while she was aware of the Marsch family's trust, she did not know its value.

3.     Dissolution

Cleere declared that after she and Marsch petitioned for dissolution, she did not receive notice of the hearing on the petition until two hours before it began. She explained that at the hearing, she declined to go to trial because she was in another state, unable to afford an attorney, facing numerous medical challenges, and she was "the victim of emotional and mental abuse." CP at 53. Cleere's CR 60(b) motion includes medical documentation that describes three surgeries in 2020 and admission for another surgery in April 2021, about two months before she signed the separation agreement.

Cleere said she had two more surgeries after the dissolution. She was only able to "gather the strength to confront" Marsch "with the passage of time since the divorce." CP at 54.

B.     Marsch's Declaration

Marsch filed a declaration in response to Cleere's CR 60(b) motion. He declared that he "fully disclosed all assets" while he and Cleere negotiated the separation agreement, adding that the process took several months and that Cleere's brother was "intimately involved." CP at 249. He said Cleere "was able to consult with an attorney []with the final draft of the agreement in

8

hand" and he denied getting Cleere's signature through threats or coercion. CP at 251. And in response to Cleere's declaration that she felt compelled to finalize the dissolution because she could not afford a trial, Marsch said that under the agreement, Cleere had more than $800,000 in cash. Cleere does not contest this assertion.

Addressing the allegation that he concealed assets, Marsch explained that when he and Cleere entered the separation agreement, there was no Continental Airlines retirement account because the company had merged with United Airlines, so the balance in his United Airlines account represented the funds he accrued while working for both companies. Regarding the distributions he took from the United Airlines account, Marsch said he used the funds distributed during the marriage to pay off debt and pay for his and Cleere's living expenses. He emphasized that these distributions occurred before the separation.

Marsch said that the rollover mentioned in his 2017 tax return took place because a Schwab broker rolled over funds from a retirement account with an employer without his approval. Schwab reversed the rollover and returned the funds to the original account.

C.    Show Cause Hearing

After hearing from counsel for both parties, the trial court denied Cleere's motion to vacate the dissolution decree. It found there was "no evidence of mistake, surprise," or "irregularity in obtaining a judgment that would justify granting the motion to vacate." CP at 298 (Finding of Fact (FF) 2). It found Cleere "was not of 'unsound mind' at all time[s] relevant to the negotiation and signing of the [s]eparation agreement and the finalization of the dissolution matter." *Id*. (FF 3). It found Cleere did not present clear, cogent, and convincing evidence of fraud, misrepresentation,

9

or other misconduct on Marsch's part. And it found that both parties "had resources available to retain counsel." *Id.* (FF 7).

Cleere appeals the trial court's denial of her CR 60(b) motion. Cleere challenges findings 2, 4, and 7 and contends the trial court should have granted the motion to vacate under CR 60(b)(1) and (4).

## ANALYSIS

As the Washington Supreme Court has recognized, "'trial court decisions in a dissolution action will seldom be changed upon appeal,' and the spouse challenging the trial court's decision 'bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court.'" *In re Marriage of Bresnahan*, 21 Wn. App. 2d 385, 407, 505 P.3d 1218 (2022) (quoting *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985)). A trial court abuses its discretion if it "relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *Tatham v. Rogers*, 170 Wn. App. 76, 89, 283 P.3d 583 (2012).

We review the trial court's factual findings for substantial evidence, "meaning evidence 'sufficient to persuade a rational[,] fair-minded person the premise is true.'" *Bresnahan*, 21 Wn. App 2d at 406 (internal quotation marks omitted) (quoting *In re Vulnerable Adult Pet. for Winter*, 12 Wn. App. 2d 815, 830, 460 P.3d 667 (2020)). "Unchallenged findings are verities on appeal," and we "do not assess credibility or weigh evidence." *Id.* at 407. We review the trial court's legal conclusions de novo. *Id.*

I. TIMELINESS

Marsch argues that Cleere's CR 60(b) motion was untimely under both subsections (1) and (4), so we should affirm the trial court's denial of her motion for this reason alone. He argues that "Cleere offers no valid reason for waiting 362 days to bring her motion." Br. of Resp't at 20. Marsch correctly notes that RAP 2.5(a) permits us to affirm the trial court on any ground supported by the record, so he need not have raised this timeliness argument below. However, we disagree that Cleere's motion was untimely.

A party must file a CR 60(b) motion "within a reasonable time." CR 60(b). Additionally, a party contending that subsection (1) applies, must file the motion within a year of the trial court's judgment. *Id.* "[W]hat constitutes a reasonable time depends on the facts of the case." *In re Marriage of Thurston*, 92 Wn. App. 494, 500, 963 P.2d 947 (1998). "The mere passage of time between the entry of the judgment and the motion to set it aside is not controlling," as "a triggering event for the motion may arise well after entry of the judgment." *Id.* In evaluating timeliness, we may consider whether the delay prejudices the nonmoving party and whether the moving party had a good reason for delaying. *Id.*

Here, Cleere filed the motion less than a year after the trial court entered the dissolution decree, so she did not go beyond the specific time limit delineated in CR 60(b). And the record does not indicate that Cleere failed to file the motion within a reasonable time. Marsch does not argue that the delay prejudiced him in any specific way, and he does not contest Cleere's statement that she faced serious health challenges during and after the dissolution. We decline to conclude that Cleere's motion was untimely.

## II. PARTIES' RESOURCES

Cleere argues that substantial evidence does not support the trial court's finding that both parties had the resources necessary to retain counsel.

The record shows that the separation agreement entitled Cleere more than $700,000—even excluding proceeds from the sale of the condominium. While Cleere only received this amount after entering the agreement, at a hearing on the petition for dissolution, the trial court offered to set a trial so Cleere could contest the agreement, and she declined the trial court's offer. More than a year later, when Marsch argued at the show cause hearing that Cleere "had money available" at the time of the dissolution, Cleere did not offer any evidence that she lacked access to funds at the time of the dissolution hearing when the trial court offered her more time before finalizing the dissolution. *See* Verbatim Rep. of Proc. at 12, 17; *see also* CP at 216.

We hold that substantial evidence supports the trial court's finding.

## III. MISTAKE AND EXCUSABLE NEGLECT UNDER CR 60(b)(1)

Cleere argues that the trial court should have granted her CR 60(b)(1) motion to vacate the dissolution decree based on mistake and excusable neglect because Marsch took advantage of her "ignorance of their true assets as well as her unawareness of her rights in the court process." Br. of Appellant at 15. Cleere also challenges the trial court's finding that there was no evidence of mistake, surprise, or irregularity in obtaining the dissolution. Cleere contends that her "physical and mental states were fragile" and that she "alleged the requisite mental state [for] qualifying for relief from a judgment based on excusable neglect." *Id.* at 15, 17.

Marsch responds that the trial court had "ample evidence to support its finding that the property listed in the parties' separation contract rested on no mistake." Br. of Resp't at 26.

Moreover, he argues that because Cleere did not argue excusable neglect below, she "waived any argument that the trial court should have vacated the decree based on the 'excusable neglect' standard." *Id.* at 30. We hold that substantial evidence supports the trial court's finding and the trial court did not err in declining to grant Cleere's motion to vacate based on mistake and excusable neglect.

We use contract principles to analyze dissolutions, such as this one, that are based on separation agreements. *See Haller v. Wallis*, 89 Wn.2d 539, 544, 573 P.2d 1302 (1978); *In re Est. of Harford*, 86 Wn. App. 259, 262, 936 P.2d 48 (1997). "A party to a contract is entitled to reformation of the contract if either there has been a mutual mistake or one party is mistaken and the other party engaged in fraud or inequitable conduct." *Wash. Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 525, 886 P.2d 1121 (1994).

Cleere does not argue that there was a mutual mistake: instead, she argues that she was mistaken about the property she and Marsch owned and that Marsch concealed property despite his fiduciary duty to disclose it before dissolution. A party engages in fraud or inequitable conduct by concealing a material fact from the other party despite a duty to disclose that fact. *Id.* at 256. Spouses "have a specific fiduciary duty to disclose all community and separate property before dissolution." *Bresnahan*, 21 Wn. App. 2d at 403.

Here, substantial evidence supports the trial court's finding that there was no evidence of a mistake in obtaining the dissolution decree that would justify granting the motion to vacate. The record lacks affirmative evidence of Marsch concealing property from Cleere.

First, the separation agreement lists most of the assets Cleere claims Marsch failed to disclose. The agreement includes the values of the Marsch family's trust, the United Airlines

retirement account, the Schwab rollover retirement account, the Alliant savings account, the Schwab brokerage account, and Cleere's Continental Airlines retirement account. These values were current as of late June 2021, shortly before the parties entered the separation agreement that was adopted in the dissolution decree. And while Cleere declared that "there may be a Fidelity investment account somewhere[] that has not been fully disclosed," this statement is speculative, and there is nothing in the record to support it. CP at 54.

Moreover, nothing in the record contradicts Marsch's explanations regarding his Continental Airlines retirement account, the pre-separation distributions from the United Airlines retirement account, or the rollover reflected in his 2017 tax return. Marsch declared that when he and Cleere entered the separation agreement, he had no Continental Airlines retirement account because the company had merged with United Airlines. Additionally, while Cleere's brother pointed to distributions from the United Airlines account as evidence of Marsch concealing assets, Marsch stated that he used the money from those pre-separation distributions on living expenses for both parties and to pay off their debt. And Marsch explained that the rollover in his 2017 tax return took place because of a broker's mistake, so the rollover was reversed.

The trial court's ruling shows that it credited Marsch's explanations, and we "do not assess credibility or weigh evidence." *Bresnahan*, 21 Wn. App 2d at 407. In sum, given the absence of any affirmative indication that Marsch concealed property from Cleere, substantial evidence supports the trial court's finding that there was no evidence of a mistake, and the findings support its conclusion that there was no basis to vacate the dissolution under CR 60(b)(1).

Although Cleere also argues that she is eligible for relief from the dissolution decree based on excusable neglect, a judgment based on an agreement between the parties cannot be altered on

14

this ground. *Haller*, 89 Wn.2d at 544; *Harford*, 86 Wn. App. at 263; *Lane v. Brown & Haley*, 81 Wn. App. 102, 109, 912 P.2d 1040 (1996).

The trial court did not abuse its discretion by declining to vacate the dissolution decree under CR 60(b)(1).

## IV. MISREPRESENTATION AND MISCONDUCT UNDER CR 60(b)(4)

Cleere argues that the trial court should have granted her CR 60(b)(4) motion to vacate the dissolution decree based on Marsch's "misrepresentation and misconduct in disclosing assets." Br. of Appellant at 18. She challenges the trial court's finding that she did not present clear, cogent, and convincing evidence of fraud, misrepresentation, or other misconduct by Marsch. She contends that her declaration "clearly shows . . . Marsch misrepresented the community assets." *Id.* at 19. And she contends that the trial court should have at least "held an evidentiary hearing to explore what happened with the rollovers, distributions, and the 'merging' of the Continental and United pensions." *Id.* We disagree.

"To prevail on a CR 60(b)(4) motion, the moving party 'must establish by clear and convincing evidence that the fraudulent conduct or misrepresentation caused the entry of the judgment such that the losing party was prevented from fully and fairly presenting its case or defense.'" *Bresnahan*, 21 Wn. App. 2d at 406 (quoting *Winter*, 12 Wn. App. 2d at 830). "Clear and convincing evidence is evidence showing that a fact is 'highly probable.'" *Id.* (quoting *Winter*, 12 Wn. App. 2d at 830.

For example, in *Bresnahan*, a party to a marital dissolution incorporating a settlement agreement moved to vacate the dissolution decree after she discovered an undisclosed bank account her former husband used to accumulate community property during the dissolution

proceedings. *Id.* at 392. The parties then stipulated that if any additional undisclosed assets were to be discovered, the former wife would be entitled to 57 percent of the discovered funds. *Id.* at 393. A year later, the former wife moved to vacate the dissolution decree again after discovering three more undisclosed accounts, all opened during the marriage and collectively worth about $345,600. *Id.* at 394. Although the former husband declared that he "'never deliberately concealed assets,'" the trial court noted that based on the value of these accounts, it seemed "'incomprehensible'" that he "'did not realize that such sums were not disclosed.'" *Id.* at 395, 408.

We affirmed the trial court's decision to vacate both the property division in the dissolution decree and the subsequent stipulation and order under CR 60(b)(4), holding that substantial evidence supported the trial court's finding that the former husband engaged in misrepresentation and misconduct. *Id.* at 401, 409, 413. We reasoned that the trial court did not credit the former husband's assertion that any concealment was not deliberate, and "we do not review a trial court's evaluations of credibility on appeal." *Id.* at 408.

This case is distinguishable. In *Bresnahan*, the trial court vacated its prior dissolution decree and we affirmed, applying the deferential standard of review described above. But here, the trial court declined to vacate its dissolution decree. Moreover, Cleere failed to provide proof that Marsch hid assets or misled her regarding the values of the couple's assets. And Marsch answered the questions Cleere raised in her motion. For example, he explained the lack of a separate Continental Airlines retirement account. Unlike the trial court in *Bresnahan*, which specifically found the former husband's explanations "'incomprehensible'" in light of the proof provided to the court, 21 Wn. App. 2d at 408, the trial court's ruling in this case shows that it found Marsch's explanations regarding these assets credible. As in *Bresnahan*, we will not review the trial court's

credibility determination on appeal. *Id.* Substantial evidence supports the trial court's finding that Cleere did not present clear, cogent, and convincing evidence of fraud, misrepresentation, or other misconduct.

The trial court did not abuse its discretion by declining to vacate the dissolution decree under CR 60(b)(4).

## ATTORNEY FEES

Marsch requests attorney fees on appeal based on the separation agreement. The separation agreement provides that if either party hires an attorney to protect their interest with respect to the agreement, the prevailing party is "entitled to receive . . . reasonable attorneys' fees." CP at 9.

Marsch and Cleere's separation agreement requires us to award Marsch attorney fees because he is the prevailing party. Cleere's contention that Marsch cannot make this argument for the first time on appeal fails because Marsch specifically seeks attorney fees *on appeal* based on RAP 18.1. We therefore award Marsch his attorney fees on appeal in an amount to be determined by our commissioner.

Cleere also requests that we award her attorney fees on appeal under RCW 26.09.140,[2] as "she is living on her social security disability and is waiting on properties to sell." Br. of Appellant at 22. But she has not filed the affidavit that is required under RAP 18.1(c) for us to consider awarding attorney fees on this basis. We therefore decline to award Cleere attorney fees or offset the fee award to Marsch.

---

[2] We cite the current version of the statute because the relevant language has not changed.

No. 58052-7-II

CONCLUSION

We affirm. We award Marsch attorney fees on appeal under the separation agreement in an amount to be determined by our commissioner.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, C.J.

VELJACIC, J.